**E-FILED**
Friday, 12 September, 2014  05:03:36 PM
Clerk, U.S. District Court, ILCD

## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS
## URBANA DIVISION

| | |
|---|---|
| TRANS COASTAL SUPPLY COMPANY, INC., ) | |
| ) | |
| *Plaintiff*, ) | |
| ) | |
| v. ) | Case No. 14-2221 |
| ) | |
| SYNGENTA AG, ) | |
| SYNGENTA CROP PROTECTION AG, ) | Judge TBD |
| SYNGENTA CORPORATION, ) | |
| SYNGENTA CROP PROTECTION, LLC and ) | |
| SYNGENTA SEEDS, INC., ) | ***JURY TRIAL DEMANDED*** |
| ) | ***EQUITABLE RELIEF IS SOUGHT*** |
| *Defendants*. ) | |
| _____ ) | |

### CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff, Trans Coastal Supply Company, Inc., ("Trans Coastal"), by its undersigned attorneys, on its own behalf and on behalf of all others similarly situated, upon personal knowledge as to itself and its own acts, and upon information and belief as to all other matters, brings this action against Defendants Syngenta AG, Syngenta Crop Protection AG, Syngenta Corporation, Syngenta Crop Protection, LLC, and Syngenta Seeds, Inc., (collectively "Defendants" or "Syngenta") and alleges as follows:

### NATURE OF THE CASE

1. Plaintiff is an international exporter of corn and dried distillers grain with solubles ("DDGS") with the vast majority of its customers located in China. Plaintiff was founded in 2007 by Pamela Moses and Robert Briscoe. In the past six years, Plaintiff has grown from a small startup to the one of the largest corn and DDGS exporters in the United States. By 2013,

Plaintiff had become the 19th largest exporter of all good types in the United States, as ranked by the Journal of Commerce.

2.   However, because of Syngenta's behavior, described in greater detail below, Plaintiff's livelihood is at risk. Beginning in 2009 Syngenta prematurely released a genetically modified corn trait, Agrisure VIPTERA™ ("VIPTERA"), into the U.S. market. Syngenta's actions in turn caused the contamination of the entire U.S. corn supply with a genetic trait called MIR162, which is prohibited from sale in countries such as China that have not approved it.

3.   Due solely to Syngenta's premature release of Agrisure VIPTERA corn ("VIPTERA corn"), Plaintiff's sales to China have stalled, its contracts are being defaulted on regularly, and it is incurring costs including but not limited to storage, moving, late customs clearance, customs checking, import taxes and diversion fees.

4.   Plaintiff has incurred losses due to a) rejection of its corn and DDGS by its customers, and subsequent default on contracts of rejected corn and DDGS, and b) increased costs due to MIR162 contamination. For example, Plaintiff estimates its current DDGS losses, due solely to Syngenta's release of Agrisure VIPTERA, are $16 million. Further, Plaintiff expects at least an additional $19 million in losses due to rejection of its DDGS to be incurred in the next two months as well as additional costs. Plaintiff estimates its losses on shipments of corn exceed $6 million.

5.   Syngenta is, among other things, in the business of developing and selling, in interstate commerce, corn seed with certain genetically modified traits. After development, Syngenta licenses corn seed with multiple genetically enhanced features, called "trait stacks," to seed manufacturers, including Syngenta subsidiaries.

6.   At issue here is Syngenta's Corn Event MIR162, which is utilized in the Agrisure Viptera™ and Agrisure Duracade™ trait stacks. Agrisure Duracade™ is Syngenta's second generation of MIR162 corn and was released sold and distributed for planting in 2014.  Over seventy (70) varieties of corn utilize the MIR162 trait to produce a protein that provides insect resistance. Colloquially, these corn varieties are referred to as Viptera corn and Duracade corn, representing the traits which the corn will express.

7.   Plaintiff's harm arises from Syngenta's intentional and reckless release of Agrisure Viptera and Agrisure Duracade into the U.S. market, prior to Syngenta obtaining approval for MIR162 import into China.

8.   Viptera corn has been grown, licensed, marketed, sold, and/or otherwise disseminated in the United States from, at least, early 2009. Despite this, and as of the time of filing this complaint, crops or products containing MIR162 lacked approval for import into China.

9.   Although it lacked approval, Syngenta has misinformed farmers, grain elevators, grain exporters, its investors and the general public into believing that approval from China was imminent. Notably, during Syngenta's first quarter 2012 earnings conference call, Syngenta CEO Michael Mack stated "[t]here isn't outstanding approval for China, **_which we expect to have quite frankly within the matter of a couple days_** … we know of no issue with that whatsoever…." Exhibit A, Transcript of Syngenta's First Quarter 2012 Earning Conference Call Transcript (emphasis added).

10.   Contrary to Syngenta's statements, MIR162 was not approved by China in 2012 and, for that matter, still has not been approved.

11.   Even though MIR162 has never been approved for import into China, Syngenta created and distributes forms that imply MIR162 is accepted in China. Syngenta's "Request Form For

Biosafety Certificate(s) Issued by the Chinese Ministry of Agriculture" states, "Biosafety Certificates for the following transgenic event(s) were issued to Syngenta Seeds AG…by the Ministry of Agriculture (MOA) of the People's Republic of China (PRC)." Syngenta's request form includes MIR162 among approved genetically modified traits, even though MIR162 is not approved. Exhibit B, Syngenta's Request Form For Biosafety Certificate(s) Issued by the Chinese Ministry of Agriculture.

12.   The Syngenta form further states: "The requested Biosafety Certificates will be provided to Recipient to assist Recipient in obtaining required authorization for shipments containing the above marked Corn Product(s) into China." Syngenta's form blatantly deceives those relying upon it because MIR162 has never been approved for import into China.

13.   Plaintiff and others similarly situated relied upon the statements in this and similar forms from Syngenta.

14.  In November 2013, shipments of corn and DDGS containing MIR162 arrived in China and were subsequently rejected because MIR162 was not approved for import. Since this initial rejection, China has continued to reject shipments of corn and DDGS due to MIR162 contamination. In fact, the widespread nature of MIR162 contamination has, for all intents and purposes, shutdown the 2014 corn and DDGS export market from the U.S. to China, causing billions of dollars of damages to U.S. exporters.

15. Syngenta cannot claim ignorance regarding the potential for damage when unapproved traits are released prematurely. The NGFA and NAEGA advised:

> U.S. farmers, as well as the commercial grain handling and export industry, depend heavily upon biotechnology providers voluntarily exercising corporate responsibility in the timing of product launch as part of their product stewardship obligation. Technology providers must provide for two critical elements: First maintaining access to key export markets like China, or for that matter any market like China that has a functional, predictable biotech-approval process in place;

and second, proactive transparency to all stakeholders when there is a potential for restricted marketability of their products based upon approval status in major markets. The negative consequences of overly aggressive commercialization of biotech-enhanced events by technology providers are numerous, and include exposing exporting companies to financial losses because of cargo rejection, reducing access to some export markets, and diminishing the United States' reputation as a reliable, often-preferred supplier of grains, oilseeds and grain products. Premature commercialization can reduce significantly U.S. agriculture's contribution to global food security and economic growth.

Putting the Chinese and other markets at risk with such aggressive commercialization of biotech-enhanced events is not in the best interest of U.S. agriculture or the U.S. economy.

Exhibit C, NGFA and NAEGA Joint Statement on Media Reports of Lawsuit Involving Syngenta's Agrisure Viptera™ Corn (MIR162).

16. According to the National Grain and Feed Association, Syngenta's premature release of VIPTERA corn cost the U.S. corn market at least $1 billion – if not nearly $3 billion – due to the rejection and/or seizure of U.S. containers and cargo ships carrying corn to China.  Exhibit D, Legal Obligations and Potential Market Impacts Associated with Biotech-Enhanced Seeds Producing Grain Not Approved for Import into U.S. Export Markets.

17. Syngenta's motivation in prematurely releasing VIPTERA corn is greed, as, upon information and belief, VIPTERA corn has become approximately 25% of Syngenta's corn portfolio. In 2013, Syngenta's corn sales were over $3.5 billion. Exhibit E, Syngenta's Annual Report, Form 20-F, Pg. 13, Filed with the Securities and Exchange Commission on February 13, 2014.

18. If not stopped, Syngenta is going to continue to destroy U.S. exports of corn and DDGS to China. Syngenta knows or should know that VIPTERA corn would and has crippled exports of corn and DDGS to China. Syngenta knew or should have known of the devastating effects of its release of MIR162 because, as Syngenta states in its Bio Product Launch Policy, "We will conduct market and trade assessments to identify key import markets for all of our biotech

products prior to product commercialization." *See*, www.syngentabiotech.com/biopolicy.aspx (last visited Sept. 11, 2014).

19. Yet, Syngenta is blindly continuing down the same dangerous path by releasing a second version of MIR162 corn, Duracade, once again without import approval from China.

20. Concerned about another premature release and given the damage Syngenta singlehandedly caused to the corn and DDGS export market with its premature release of Viptera corn, the National Grain and Feed Association ("NGFA") and North American Export Grain Association ("NAEGA") released a joint statement to Syngenta requesting that Syngenta stop the release of Duracade corn, so that it would not continue the cycle of rejection and damage.

21. In that statement, the two organizations stated:

> NAEGA and NGFA are gravely concerned about the serious economic harm to exporters, grain handlers and, ultimately, agricultural producers – as well as the United States' reputation to meet its customers' needs – that has resulted from Syngenta's current approach to stewardship of Viptera. Further, the same concerns now transcend to Syngenta's intended product launch plans for Duracade, which risk repeating and extending the damage. Immediate action is required by Syngenta to halt such damage.

> Exhibit F, Joint Statement Issued by NGFA and NAEGA Regarding Letter to Syngenta Requesting Suspension of Commercialization Activities of Syngenta's Agrisure Viptera® and Duracade® Corn.

22. However, despite the joint petitions from the NGFA and NAEGA, Syngenta released Duracade. This second premature release further jeopardized the Chinese import market, as Duracade contains not only unapproved MIR162, but also other unapproved traits which China could still reject. Contamination of corn and DDGS with these additional genetically modified ("GM") traits, as set forth more fully below, would continue the repeated rejections of U.S. corn and DDGS shipments to China.

23. Plaintiff and all those similarly situated are grain exporters who export corn and corn products to China and who have been damaged, at least, by: 1) Syngenta's premature release of VIPTERA corn into the U.S. corn and corn seed supply which has destroyed the export of U.S. corn and DDGS to China; 2) Syngenta's premature release of DURACADE corn into the U.S. corn and corn seed supply which, again, has effectively foreclosed U.S. exports of corn and DDGS to China; 3) Syngenta's materially misleading statements relating to the approval status of MIR162 in China upon which Plaintiff and those similarly situated relied; 4) Syngenta's negligent interference with Plaintiff's and other exporters' contracts with their Chinese customers; and 5) upon information and belief, Syngenta's  widespread contamination of the U.S. corn and corn seed supply with MIR162 which will continue to result in the destruction of the U.S. corn and DDGS export market to China for years to come.

24.  Plaintiff seeks relief on its own behalf and on behalf of all other similarly situated parties for compensatory, consequential, and exemplary damages, and injunctive relief arising from, *inter alia*:

    a.    Syngenta's harm to Plaintiff and all other similarly situated grain exporters caused by contamination of the general U.S. corn and corn seed supply in the form of, *inter alia*, (i) inability to export corn to China, (ii) seizure of property (i.e., cargo ships) by Chinese regulatory officials due to MIR162 contamination, and (iii) diminished corn and corn product prices resulting from the loss of the entire Chinese corn import market.

    b.    Syngenta's premature release of VIPTERA corn into the U.S. corn supply, knowing that once VIPTERA corn was released, it would be commingled with and would contaminate the U.S. corn supply resulting in the inability to export to markets that had not approved products containing MIR162  (such as China);

    c.    Syngenta's encouragement of farmers to plant VIPTERA corn in such a manner that it would contaminate the U.S. corn supply, so that U.S. corn could not be sold to markets that had not approved products containing MIR162;

d.  Syngenta's failure, either by itself or through its agents, to adequately warn VIPTERA corn farmers of the necessary precautions and limitations required to prevent contamination to non-VIPTERA corn via cross-pollination;

e.  Syngenta's failure, either by itself or through its agents, to adequately warn DURACADE corn farmers of the necessary precautions and limitations required to prevent contamination to non- DURACADE corn via cross-pollination;

f.  Syngenta's testing, growing, storing, transporting, marketing, selling, disposing, or otherwise disseminating VIPTERA corn in light of knowledge that it was essentially impossible to prevent contamination of other non-VIPTERA corn via cross-pollination;

g.  Syngenta's testing, growing, storing, transporting, marketing, selling, disposing, or otherwise disseminating DURACADE corn in light of knowledge that it was essentially impossible to prevent contamination of other non- DURACADE corn via cross-pollination;

h.  Syngenta's marketing, selling, or otherwise disseminating VIPTERA corn in light of knowledge that it was essentially impossible to prevent contamination of other non-VIPTERA corn via cultivation, harvesting, handling, storage, and transportation;

i.  Syngenta's marketing, selling, or otherwise disseminating DURACADE corn in light of knowledge that it was essentially impossible to prevent contamination of other non-DURACADE corn via cultivation, harvesting, handling, storage, and transportation;

j.  Syngenta's materially false statements and representations made regarding the regulatory-approval status of MIR162 and VIPTERA corn; and

k.  Syngenta's negligent interference with Plaintiff's contracts with its Chinese customers.

25. In essence, Syngenta selfishly decided it was more important to rush VIPTERA to the market to extract a profit and recoup its research costs, even though a premature release of VIPTERA corn would prevent U.S. corn, DDGS and other derivative products from being sold to markets such as China. By doing this, Syngenta crippled the 2013/14 corn export market to China. Then, in the face of damaging the entire corn market and inflicting at least $1 billion in economic damage, Syngenta prematurely released another MIR162 corn hybrid. Had Syngenta

waited until Chinese approval of MIR162 was secured, the widespread harm to the U.S. corn and DDGS market would have been avoided.

## PARTIES

26. Plaintiff Trans Coastal is an Illinois corporation with its principal place of business at 2803 North 22nd Street, Decatur, Illinois 62526. Trans Coastal is engaged in the business of buying and exporting corn and corn products. Trans Coastal also has a branch office located in Brea, California, which assists in marketing to China, Korea and other Southeast Asian destinations.

27. Defendant Syngenta AG is a corporation organized and existing under the laws of Switzerland with its principal place of business at Schwarzwaldallee 215, 4058 Basel-Stadt, Switzerland.

28. Defendant Syngenta Crop Protection AG is a corporation organized and existing under the laws of Switzerland with its principle place of business at Schwarzwaldallee 215, 4058 Basel-Stadt, Switzerland.

29. Defendant Syngenta Corporation is a Delaware corporation with a principle place of business at 3411 Silverside Road #100, Wilmington, Delaware 19810-4812 and may be served through its registered agent, The Corporation Trust Company, at Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware, 19801.

30. Defendant Syngenta Crop Protection, LLC is a limited liability company organized and operating under the laws of the State of Delaware with its principle place of business at 410 South Swing Road, Greensboro, North Carolina 27409-2012. Syngenta Crop Protection, LLC may be served through its registered agent, The Corporation Trust Company, at Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.

31. Defendant Syngenta Seeds, Inc. is a Delaware corporation with a principle place of business at 11055 Wayzata Boulevard, Minnetonka, Minnesota 55305-1526 and may be served through its registered agent, The Corporation Trust Company, at Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware, 19801.

## JURISDICTION AND VENUE

32. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1332 and supplemental jurisdiction pursuant to 28 U.S.C. §1367(a).

33. This Court has personal jurisdiction over the Defendants because Defendants regularly and systematically conduct business in this District, including, at minimum, the marketing and sale of VIPTERA and DURACADE corn within this District. Similarly, the United States District Court for the Southern District of Illinois found that jurisdiction was proper over the defendants in Illinois. *City of Greenville, Ill. v. Syngenta Crop Prot., Inc.*, 830 F. Supp. 2d 550 (S.D. Ill. 2011).

34. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and (c) because Defendants have and continue to market, sell, and/or otherwise disseminate VIPTERA and DURACADE corn in this District, and because Plaintiff is headquartered in this District.

35. Venue is proper in this Division because Plaintiff's principle place of business is located in Macon County, Illinois.

## FACTUAL ALLEGATIONS

***The United States Corn Export Market***

36. Corn is the most widely-cultivated grain crop in the U.S. The United States is a major player in the world corn trade market, and is the world's largest producer and exporter of corn.

Approximately 80 million acres of farmland is devoted to growing corn. Nearly 20% of U.S. corn is exported to other countries.

37. An additional exported corn product is dried distillers grain with solubles ("DDGS"). DDGS is a co-product from the production of ethanol from corn. DDGS is primarily used as livestock feed.

38. In 2013, 9.7 million metric tons of DDGS were exported by the United States. China was the leading destination for DDGS exports, receiving 4.49 million metric tons – 46% of the total exported. Exhibit G, Data shows high DDGS, Ethanol exports in 2013, Ethanol Producer Magazine, available at http://ethanolproducer.com/articles/10738/data-shows-high-ddgs-ethanol-exports-in-2013 (last visited Sept. 9, 2014).

39. The premature release of VIPTERA corn has hurt the U.S. corn market in many ways.

40. The NGFA estimated that the premature release of VIPTERA corn caused corn prices to decline by $0.11 per bushel. Exhibit. H, Lack of Chinese Approval for Import of U.S. Agricultural Products Containing Agrisure Viptera™ MIR 162: A Case Study on Economic Impacts in Marketing Year 2013/14.

41. Before Chinese rejection due to MIR162 contamination DDGS was priced over $250 per ton. After Chinese rejection in November 2013, DDGS prices fell as low as $85 per ton by July 2014.

42. The U.S. corn marketing system, generally, is commodity-based and gathers, commingles, and ships corn from hundreds of thousands of farms through local, regional, and terminal grain elevators. Grain elevators and other corn storage and transportation facilities are generally not equipped to test and segregate corn varieties, and to undertake testing and segregation at these facilities causes disruption and expense.

43. Corn and DDGS are exported by grain export companies, like Plaintiff.

44. In the grain-export industry, large exporters may serve many import markets, while other niche-exporters focus on a smaller selection of import markets.

***Trans Coastal Supply was a successful start-up that has been derailed solely by MIR162***

45. Trans Coastal was founded in 2007.

46. Plaintiff's business was built upon the entrepreneurial spirit of Robert Briscoe and Pamela Moses. Trans Coastal Supply was started to fulfill a niche in the market – the purchase and shipment of grains in *containers* that must be returned abroad, as opposed to loading cargo *vessels* solely for the purpose of grain shipment.

47. At the outset, the company was started and operated – literally – out of Ms. Moses's car and home.

48. Within four months after starting the business, Ms. Moses and Mr. Briscoe had constructed a small two-room office at the loading facility in Decatur, Illinois.

49. Plaintiff has been located at its current location since 2010.

50. The container export market deals in export quantities much smaller than that of the vessel export market. A typical container shipment would carry approximately twenty-five tons, whereas a vessel shipment can carry up to 50,000 tons.

51. Plaintiff's customers include small and medium sized Chinese companies who do not need the quantity of U.S. corn or DDGS delivered by a vessel shipment, as well as large Chinese companies who require smaller shipments of corn and corn products in between larger vessel shipments.

52. Plaintiff's specialty is consistently providing manageable quantities of grain to small, independent Chinese companies.

53. Given the size of shipments within the container market, margins and profits are smaller than that of vessel shippers.

54. In 2007, Plaintiff had very few customers, shipped 470 containers, and had $3.5 million in revenue.

55. Plaintiff's business grew rapidly. By 2010, Plaintiff had expanded to 150 customers, shipped 33,000 containers, and had $161 million in revenue.

56. Even after this success Plaintiff's business continued to grow. By 2013, Plaintiff had expanded to nearly fifty employees, shipped over 50,000 containers, and had $539 million in revenue.

57. Given the success of its business, Plaintiff was given the "2013 Governor's Export Award" by Governor Pat Quinn.

58. In 2013, Plaintiff was ranked as the nineteenth largest exporter—not just of corn or agricultural products, but of any product—by the Journal of Commerce.

59. For comparison, the eighteenth largest exporter was Archer Daniels Midland.

60. Ms. Moses and Mr. Briscoe attribute the rapid growth and success of their business to the emerging Chinese import market, specifically for U.S. corn and DDGS.

61. Plaintiff's shipments relevant to this action can be categorized as: 1) corn known or believed to contain MIR162; 2) DDGS known or believed to contain MIR162; 3) corn believed to be MIR162-free; and 4) DDGS believed to be MIR162-free.

62. Regardless of the categorization of Plaintiff's corn and DDGS, MIR162 has hurt sales.

63. After rejections of U.S. corn and DDGS by China started in late 2013, Plaintiff saw its growth stop. In 2014, Plaintiff has seen its shipment of corn and DDGS into China drop dramatically.

64. The corn and DDGS containers that Plaintiff has shipped and continues to ship have been rejected for MIR162 contamination or are awaiting testing. Troublingly, even some of the shipments of corn and DDGS that were purchased as MIR162-free have been found MIR162 positive upon arrival to China.

65. For the first time since the start of the business, Plaintiff has taken heavy losses. These losses arise from the frequent rescission of existing contracts and increased expenses that would not have been incurred if the contracts were honored. Plaintiff's customers refuse to honor contracts because they fear that the corn and DDGS is contaminated with MIR162, which renders the cargo essentially worthless in China.

66. Further, Plaintiff has imminent losses of, at least, an additional $19 million.

67. Plaintiff has also suffered damage in the form of lost opportunities. For example, Plaintiff purchased and staffed an existing grain loading facility to increase its container loading capabilities. Syngenta's damage to the corn and DDGS export market has prevented Plaintiff from fully utilizing this extra capacity; however, Plaintiff is still paying salaries and costs associated with it.

68. Plaintiff has also suffered non-economic losses including damage to its reputation and loss of goodwill among its customers and commercial suppliers. All of these problems arise solely due to Syngenta's premature release of VIPTERA corn.

### Syngenta's VIPTERA Corn

69. VIPTERA corn was developed by Syngenta by using modern biotechnology techniques. Syngenta modified the corn by inserting genetic material from a bacterium, *Bacillus thuringiensis* ("*Bt*"). Within the corn-biotechnology industry, corn manipulated in this fashion is commonly referred to as "*Bt* corn."

70. The specific genetic material inserted into the genome of VIPTERA corn allows the genetically altered corn to produce certain proteins including Cry1Ab, mCry3A, and Vip3A.

71. These proteins have insecticidal properties which, according to Syngenta, "controls more insects than any other trait stack on the market" including Black Cut Worm, Corn Earworm, European Corn Borer, Fall Armyworm, Western Bean Cutworm, and Stalk Borer.

72. VIPTERA's insecticidal protection comes from the Vip3A protein, a "vegetative insecticidal protein," which binds to the insect's midgut epithelium and forms pores, killing the insect before further crop damage may be done.

73. Syngenta invested approximately $200 million and five to seven years developing VIPTERA corn.

74. Notably, VIPTERA corn is protected by Syngenta patent(s) which gives Syngenta the right to exclude others from selling products with the VIPTERA corn traits. This is part of its motivation in pushing this product prior to approval from China (*i.e.,* Syngenta is attempting to maximize its period of exclusivity when no others can sell VIPTERA corn).

75. As a bio-engineered product, VIPTERA corn was subject to U.S. and foreign regulatory approval prior to cultivation or import.

76. Syngenta had registered VIPTERA corn as a pesticide with the Environmental Protection Agency.

77. VIPTERA was deregulated by the U.S. Department of Agriculture in April 2010.

78. In the spring of 2010, Syngenta made the decision to release VIPTERA corn commercially for the 2010/11 growing season. This release came at a time when VIPTERA corn lacked approval by import markets such as China, Japan, and the European Union.

79. At the time of release, Syngenta believed and reassured the public that approval in Japan and the European Union was imminent. Syngenta, however, was silent regarding China.

80. Japan and the European Union have since approved the importation of VIPTERA corn. China, however, has not. Despite this, Syngenta encouraged and still encourages farmers to grow VIPTERA corn.

81. To date, China has still not approved the importation of any product containing MIR162.

***Contamination of the United States Corn Supply***

82. Commingling different varieties of corn is always a risk during planting, harvesting, drying, storage, and transportation of corn. Thus, once released, a corn variety will, without adequate protections, contaminate the broader corn supply.

83. Despite contamination risks, Syngenta offered farmers a "side-by-side program" which encouraged farmers to plant VIPTERA corn side-by-side with other corn seed. Exhibit I, Plaintiff's Appendix in Support of Motion for Preliminary Injunction, Decl. of Charles Lee, *Syngenta Seeds, Inc., v. Bunge North America, Inc.*, No. 5:11-cv-04074-MWB, (N.D. Iowa Aug. 26, 2011) ECF No. 5-1 at 12.

84. Rather than instruct its customers on how to limit the contamination of VIPTERA corn into the broader corn supply, Syngenta's side-by-side program encouraged farmers to not take precautions. By doing this, Syngenta helped spread the amount of MIR162 that would appear in the U.S. corn and DDGS supply, thus putting at risk Chinese exports.

85. Syngenta knew or should have known that encouragement of side-by-side planting of VIPTERA and non-VIPTERA corn would inevitably lead to commingling.

86. Syngenta knew or should have known that this commingling would result in rejected shipments of U.S. corn and DDGS by Chinese regulatory officials.

16

87. In short, Syngenta knew or should have known of the high risk and consequences of commingling VIPTERA corn with the broader corn supply. Syngenta encouraged farmers to disregard practices designed to prevent commingling and encouraged side-by-side planting of VIPTERA and non-VIPTERA corn, essentially ensuring the contamination by commingling.

88. Corn replicates by cross-pollination from one plant to another. Pollen from corn has been shown to "drift" over considerable distances and cross-breed with corn from other plants.

89. The corn resulting from cross-pollination can express traits from pollen-donating plant.

90. Those knowledgeable in the field suggest that, at a minimum, pollen can travel 200 feet. Some studies have found that cross-pollination cannot be eliminated, even at a distance of one-third of a mile. Exhibit J, Peter Thomison, *Managing "Pollen Drift" to Minimize Contamination of Non-GMO Corn*, The Ohio State University Extension Fact Sheet, available at http://ohioline.osu.edu/agf-fact/0153.html (last visited Sept. 9, 2014).

91. The take home is, without adequate precautions, neighboring corn fields will exchange pollen.

92. The Thomison article states "[e]ach corn plant is capable of producing 4 to 5 million pollen grains." *Id*.

93. Further, the Thomison article states "even if only a small percentage of the total pollen shed by a field of corn drifts into a neighboring field, there is considerable potential for contamination through cross pollination." *Id*.

94. Syngenta, as a leader in the field of corn biotechnology, understood or should have understood the effects of contamination by cross-pollination at the time of the release of VIPTERA corn.

95. Syngenta recognized in its "Agrisure™ Traits Stewardship Guide" that "[a] normal occurrence in corn production is cross-pollination…" and "[i]t is not possible to achieve 100% purity of seed or grain in any corn production system and a certain amount of adventitious pollen movement will occur." Exhibit K, Syngenta 2011 Agrisure™ Traits Stewardship Guide.

96. Other seed producers agree. DuPont Pioneer published a fact sheet stating "Remember that achieving 100% purity is virtually impossible in seed or grain production." Exhibit L, DuPont Pioneer Maximizing Genetic Purity of Corn in the Field, available at https://www.pioneer.com/CMRoot/Pioneer/US/products/stewardship/genetic_purity.pdf

(last visited Sept. 9, 2014).

97. Upon information and belief, Syngenta encouraged cross-pollinating of VIPTERA corn with non-VIPTERA corn and its "side-by-side program" because it knew that cross-pollination was certain to occur. Exhibit I, Plaintiff's Appendix in Support of Motion for Preliminary Injunction, Decl. of Charles Lee, *Syngenta Seeds, Inc., v. Bunge North America, Inc.*, No. 5:11-cv-04074-MWB, (N.D. Iowa Aug. 26, 2011) ECF No. 5-1 at 12. Unfortunately, this led to additional contamination of the U.S. corn supply with the MIR162 trait.

98. In short, Syngenta knew that pollen drift was certain to occur and encouraged farmers to plant VIPTERA corn in a way that promoted cross-pollination and thus contamination of the U.S. corn supply.

***VIPTERA Has Been So Controversial, Some Grain Handlers Refused to Accept It.***

99. After the 2011 planting season, but before the 2011 harvest season, Bunge North America, Inc. ("Bunge"), a grain elevator and handler based in St. Louis, Missouri, posted signs and distributed materials stating that VIPTERA corn would not be accepted during the harvest season.

18

100.  Bunge cited the lack of Chinese import approval as its reason for not accepting VIPTERA corn.

101.  In response, Syngenta sued Bunge in the Northern District of Iowa, seeking, *inter alia*, preliminary and permanent injunctions requiring Bunge to stop posting materials regarding its refusal to accept VIPTERA corn, and, more importantly, requiring Bunge to accept VIPTERA corn at its facilities. Complaint, *Syngenta Seeds, Inc., v. Bunge North America, Inc.*, No. 5:11-cv-04074-MWB, (N.D. Iowa Aug. 22, 2011) ECF No. 1.

102.  Bunge responded to the lawsuit stating "…we are surprised and disappointed that Syngenta has taken an action which could put at risk a major export market for U.S. corn producers [–] China." Further, in the same statement, Bunge made clear:

> Bunge's decision not to accept Agrisure Viptera is consistent with the North American Export Grain Association's (NAEGA) policy to advocate that technology providers receive all major international approvals for a trait prior to seed sales. The grain export industry, which includes Bunge, notified Syngenta more than a year ago that China is considered a major export market.
>
> Exhibit M, Statement of Soren Schroder, President and CEO of Bunge North America, https://www.bungenorthamerica.com/news/28-bunge-responds-to-syngenta-suit (last visited August 21, 2014).

103.  Syngenta's request for a preliminary injunction was denied. Memorandum Opinion and Order: Denying Motion for Preliminary Injunction, *Syngenta Seeds, Inc., v. Bunge North America, Inc.*, No. 5:11-cv-04074-MWB, (N.D. Iowa Sept. 26, 2011) ECF No. 42.

104.  Major grain handlers including Bunge, Archer Daniels Midland, Cargill, and Consolidated Grain and Barge still refuse to accept VIPTERA corn, as preventing commingling is essentially impossible.

***Collapse of the Chinese Import Market***

105. In the past, Japan and Canada were considered the major corn import markets. Accordingly, many biotech-trait commercialization decisions were made based on approval obtained from these two countries.

106. However, in recent years, China has become a major importer of corn and corn products. A recent study by the USDA shows that during the 2012/13 import year China imported five times more corn than Canada. http://www.usda.gov/oce/commodity/wasde/latest.pdf (last visited Sept. 11, 2014).

**Table 1**
**Corn Imports By Country By Trade Year**
**(Thousand Metric Tons)**

|  | 2009/10 | 2010/11 | 2011/12 | 2012/13 | 2013/14 (estimated) |
|---|---|---|---|---|---|
| **Japan** | 15,971 | 15,648 | 14,892 | 14,412 | 15,500 |
| **China** | 1,296 | 979 | 5,231 | 2,702 | 3500 |
| **Canada** | 2100 | 950 | 870 | 480 | 400 |

Data compiled from USDA World Agricultural Supply and Demand Estimates available at http://www.usda.gov/oce/commodity/wasde/

107. China, having not approved the importation of VIPTERA corn, maintains a zero-tolerance policy regarding contamination of corn imports with corn containing MIR162.

108. This means that ***any*** detection of MIR162 in a shipment to China could result in rejection of that shipment.

109. Syngenta had knowledge of China's zero-tolerance policy prior to the commercialization of VIPTERA corn.

110. Further, Syngenta had knowledge that there was no means of detecting a "zero" level of MIR162 in a given sample. At least, Charles Lee – Syngenta's North American Head of Corn – stated, when asked about potential detection methods, "Yeah, nothing can detect to zero." Exhibit N, Deposition of Charles R. Lee – Sept. 7, 2011, *Syngenta Seeds, Inc., v. Bunge North*

*America, Inc.*, No. 5:11-cv-04074-MWB, (N.D. Iowa Sept. 15, 2011) ECF No. 32-6, 92:21. In other words, there is always a risk that if a corn shipment is tested in the U.S. and is negative for MIR162, a second test at port could result in a positive for MIR162.

111.   Even further, when questioned about the decision-making process to commercialize VIPTERA corn, Mr. Lee stated that commercialization was premised on U.S. deregulation and Japanese and Canadian approval. *Id*. at 82:15-20.

112.   Mr. Lee stated in his deposition "we operate on the principle that we need U.S., Japan and Canada. And so once we have those approvals, we do commercialization of the product…." *Id*. at 90:10-13.

113.   Therefore, Syngenta recognized that it is improper to rush a product to market without first receiving approvals from certain other countries to which U.S. corn is exported. Despite this knowledge, it did not wait for Chinese approval.

114.   There was no requirement that Syngenta commercialize VIPTERA corn at this time. However, as stated by Mr. Lee, Syngenta was "trying to recoup [its] costs as an organization." Further, Syngenta "[l]ike anybody, [wanted] to derive some income from [its] products." *Id*. at 70:22 – 71:13.

115.   Syngenta also commercialized VIPTERA corn before major market approval as "[y]ou have to operate in the nongeneric period [of Syngenta's patent covering VIPTERA corn]. You like to optimize that period." *Id*. at 72:3-6.

116.   On or about November 2013, cargo shipments of U.S. corn and DDGS were rejected by Chinese regulatory officials after testing positive for VIPTERA corn.

117.   On December 24, 2013, the General Administration of Quality Supervision, Inspection and Quarantine of China issued a warning notification strengthening the inspection and

supervision for the import of GMO feed materials. This notification stated the impetus was that Shanghai Chinese Inspection and Quarantine Service ("CIQ") had detected MIR162 in DDGS shipments. The December 24 notification indicated that all batches of corn and DDGS would now be tested at the Chinese ports for MIR162, and that any cargo which tested positive for MIR162 would be returned or destroyed.

118.   This notification hurt the corn and DDGS export industry because prior to this notification 1) statements from the seller/exporter that the products were tested and negative for MIR162 were sufficient and 2) DDGS was not required to be MIR162 free.

119.   After this notification, corn and DDGS transactions were at increased risk. DDGS was initially considered to be a product with no risk for seizure due to containing MIR162; now it was a product that was at risk.

120.   Also, since China initially only required certification from the seller/exporter that the shipped corn did not contain MIR162, a negative test result from the seller/exporter was sufficient. This allowed predictability in that customers in China would know from the beginning of a contract that the corn and DDGS products would clear Chinese customs.

121.   Now that testing occurred at Chinese ports, an increased risk was placed on Plaintiff's and other similarly situated parties' contracts, because, as Syngenta testified, there was no way to detect a "zero" level of MIR162 (i.e., a negative test of a container in the U.S. could still result in a positive test in China). This caused an initial amount of Chinese customers to walk away from their contracts, placed a great deal of uncertainty on the market, and hurt corn and DDGS prices.

122.   Additionally, tests at Chinese ports led to increased port and storage costs (e.g., while waiting for testing to occur, or while waiting for test results, additional port and storage fees were incurred). Further, some cargo ships found to contain VIPTERA corn were not rejected, but

rather have been effectively seized by the CIQ, and the owners of those ships are forced to pay approximately $100 per day, per seized container in storage fees.  Beyond this, if a corn or DDGS shipment tested positive for MIR162 at a Chinese port, and if the shipment was able to leave China, Plaintiff was faced with even heavier losses due to diversion costs.

123.  Given the increased frequency that corn and DDGS shipments were testing positive, in July 2014, China again strengthened its policy regarding MIR162. The new policy required the U.S. to provide GMO test reports with an official stamp for each and every DDGS shipment destined to China to certify those shipments would be free of MIR162. Any U.S. shipment not accompanied with a GMO test report with an official stamp will not be allowed to be imported into China. This notice went into effect immediately, thus all DDGS shipments departing the United States beginning on July 24, 2014 would be rejected without an "official stamp."

124.  The new "official stamp" requirement is troubling in that no such certification exists. In essence, this new policy halted all DDGS exports to China.

125.  And again, the only reason for this change in policy is due to MIR162.

126.  Since November of 2013 (i.e., the positive tests for MIR162 in China), Chinese imports for U.S. corn have fallen by an estimated 85%.

127.  This market shift comes as China was expected to import a record high 7 million tonnes of U.S. corn according to the U.S. Department of Agriculture.

128.  An additional harm caused by MIR162 shipments is that many companies seeking to import U.S. corn and DDGS who have accepted shipment only to later have the product test positive for MIR162 have been placed on a "blacklist" by the CIQ. Exhibit O, List of Companies on CIQ Blacklist.

129.  Approximately half of the companies placed on the CIQ blacklist were customers of Plaintiff.

130.  Many of Plaintiff's customers who have been blacklisted due to accepting MIR162 positive shipments have now defaulted on contracts previously made with Plaintiff because of the continued risk of MIR162 contamination.

131.  The rejection of U.S. corn imports has and continues to negatively impact the global corn market.

132.  Syngenta knew or should have known that disruption to the Chinese import market would influence the global corn market.

133.  Syngenta knew or should have known that contracts between grain exporters and Chinese corn and DDGS buyers would be negatively affected if MIR162 was found in grain exports to China.

### *Syngenta's Admissions Regarding MIR162*

134.  Syngenta knew or should have known of the damage that the rejection of corn by China would cost. For example, the unrebutted evidence at the hearing on Syngenta's Motion for Preliminary Injunction indicated that the redirection costs for a rejected shipment of contaminated corn could be anywhere from $4 million to $20 million **for a single shipment**. Memorandum Opinion and Order Regarding Plaintiff's Motion for Preliminary Injunction, *Syngenta Seeds, Inc., v. Bunge North America, Inc.*, No. 5:11-cv-04074-MWB, (N.D. Iowa Sept. 26, 2011) ECF No. 42, at 12 (emphasis added).

135. Syngenta also knew or should have known that releasing MIR162 prior to Chinese approval would affect corn prices.

136.  In Syngenta's 2010 Full Year Results, CEO Michael Mack ("Mr. Mack") stated that Chinese "import requirements alone influence global commodity prices." Exhibit P.

137.  During Syngenta's 2011 Half Year Earnings Report, Mr. Mack again commented on the importance of the Chinese market, stating that China "continues to have the greatest impact on world markets, with increasing imports not just of soybeans but also now of corn." Exhibit Q.

138.  In response to a question during the first quarter 2012 earnings conference call regarding the status of Chinese approval of VIPTERA, Mr. Mack stated "[t]here isn't outstanding approval for China, which we expect to have quite frankly within the matter of a couple days … we know of no issue with that whatsoever…." Exhibit A.

139.  This needs to be emphasized: the CEO of Syngenta publicly stated in 2012 that approval of VIPTERA was days away.

140.  Mr. Mack's statement was made as an advertisement for VIPTERA corn.

141.  Mr. Mack refers specifically to VIPTERA corn.

142.  Mr. Mack had an economic motivation for making this statement – continued sales of VIPTERA corn.

143.  Mr. Mack's statement was disseminated sufficiently to constitute promotion within the grain industry.

144.  This statement, and others like this, dangerously impacted the corn market by, for example, encouraging 1) farmers to plant MIR162, 2) grain elevators to accept and comingle MIR162 with other grains, and 3) exporters to purchase and ship products containing MIR162.

145.  Obviously, Syngenta was incorrect with its "matter of a couple days" prediction.

146.  In 2014, Syngenta knew or should have known that China would not approve MIR162 in time for 2014 planting. For example, Mr. Mack stated during Syngenta's first quarter 2014

conference call "I think it is fair to say at this point in time that we don't have – that we will not have any approval before the start of the season.  That's for sure." Exhibit R.

147.  Despite the negative impact MIR162 has had on the U.S. corn economy, Syngenta unbelievably attempted to pass the blame to other parties, including grain exporters such as Plaintiff.  For example, during the same first quarter 2014 conference call, in response to a question regarding indemnifying farmers who had utilized VIPTERA corn, Mr. Mack stated:

> When they sell their corn into an elevator, the elevator then sells it on to a grain trader where, if and where there is any financial exposure from a rejection, **that's between the two parties, the importer and the exporter of corn.** The farmers don't involve themselves in that. So with respect to indemnifying a farmer, backstopping their losses, there's no need for Syngenta to do that because the farmer doesn't have any exposure to that.

> *Id.* (emphasis added).

148.  Mr. Mack and Syngenta scapegoated the premature release of its product onto grain exporters, such as Plaintiff.

149.  However, in doing so, Syngenta and Mr. Mack tacitly admitted that losses due to Chinese rejection of MIR162 would be borne by grain exporters.

150.  During Syngenta's most recent earnings conference call – second quarter 2014 – Mr. Mack made the following statements regarding Chinese approval of VIPTERA corn:

> You ask about Viptera and our regulatory issues. Actually, I think this is a regulatory matter in China as opposed to any regulatory matter with Syngenta. The delays coming out of China are such that people just aren't really understanding right now even what the process is.

> We don't have it in hand and I wouldn't want to say any more about when we might have it in hand, beyond to say that there is no question; there is no technical question right now waiting from the Chinese about it, and it's been approved already in virtually every other market. So, we'll see what happens over the coming weeks, months, quarters.

> Exhibit S.

151.  This statement confirms that Syngenta recognizes there is no end in sight for problems with exports to China due to its MIR162 products. Despite this, Syngenta continues to sell MIR162 products, as well as launch new GMO products, none of which have been approved by China. In doing so Syngenta knows or should know that it will continue to destroy U.S. exports of corn to China.

152.  Further, and despite its 2014 statements as to uncertainty in China, Syngenta misled exporters into believing products containing MIR162 would be accepted in China.

153.  On its website, Syngenta has offered and continues to offer a form entitled "Request Form For Biosafety Certificate(s) Issued by the Chinese Ministry of Agriculture." *See, e.g.*, http://www3.syngenta.com/country/us/en/agriculture/Stewardship/Documents/ChinaSafetyCertificateApplication.pdf (last visited Sept. 9, 2014).

154.  This form states, "Biosafety Certificates for the following transgenic event(s) were issued to Syngenta Seeds AG…by the Ministry of Agriculture (MOA) of the People's Republic of China (PRC)." One of the "transgenic event(s)" listed on this Syngenta form is MIR162.

155.  The Syngenta form continues "The requested Biosafety Certificates will be provided to Recipient to assist Recipient in obtaining required authorization for shipments containing the above marked Corn Product(s) into China," and additionally states, "The Biosafety Certificate(s) provided allows importation of the above marked Corn Product(s) as raw materials for processing for food and feed use only, not for any research purpose or cultivation purpose."

156.  The implication of this form is clear: if completed (by, for example, an exporter), Syngenta will issue Biosafety Certificates, which will ensure the cargo can enter into China.

157.  Syngenta's request form was released as an advertisement for VIPTERA corn, as it indicates that products containing MIR162 may be imported into China.

158.  Syngenta's request form refers specifically to MIR162, the key trait in VIPTERA corn.

159.  Syngenta had an economic motivation to include MIR162 on its request form, even though Syngenta knew MIR162 was not approved for import into China – continued sales of VIPTERA corn.

160.  Syngenta's form was disseminated sufficiently to constitute promotion within the seed sales industry.

161.  The statements made by Syngenta officials above show Syngenta knew that while the other Corn Products/transgenic events identified on this form were approved in China, MIR162 was not.

162.  Syngenta's form has the tendency to deceive a substantial segment of the grain industry.

163.  Syngenta's indication that MIR162 is approved in China is likely to influence purchasing decisions.

164.  Plaintiff and other similarly situated exporters relied upon this and similar Syngenta forms to ensure their products would be able to enter China. As described above, Plaintiff and others similarly situated were harmed by such reliance.

## CLASS ACTION ALLEGATIONS

165.  Plaintiff brings this action pursuant to Rules 23(a), 23(b)(2), and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of itself and a class of persons or entities similarly situated.

166. Those similarly situated include persons and entities (excluding Syngenta and its officers, directors, and employees and all governmental entities) who, during the relevant time period engaged in the business of exporting U.S. corn and DDGS to China and have sustained damages resulting from the above-described conduct.

167. Plaintiff asserts claims against Syngenta, individually and on behalf of all class members for violations of the law as set forth below.

168. The requirements of Rule 23(a) are satisfied for the proposed class because the members of the proposed class are so numerous and geographically dispersed that joinder of all its members is impracticable. Although the exact number and identity of each class member is unknown at this time, there are believed to be hundreds of potential class members nationwide. Therefore, the "numerosity" requirement of Rule 23(a)(1) is met.

169. The commonality requirement of Rule 23(a)(2) is satisfied because there are questions of law or fact common to Plaintiff and the other members of the proposed class. Among those common questions of law or fact are:

      a.  whether Syngenta, through its acts or omissions, caused or allowed MIR162 to contaminate the U.S. corn and corn seed supplies;

      b.  whether Syngenta, through its acts or omissions, caused or allowed MIR162 to contaminate the U.S. DDGS supply;

      c.  whether Plaintiff and the members of the proposed class have sustained or continue to sustain damages as a result of Syngenta's wrongful conduct, and, if so, the proper measure and appropriate formula to be applied in determining damages for the injuries sustained;

      d.  whether Plaintiff and the members of the proposed class are entitled to compensatory, consequential, and exemplary damages;

      e.  whether Plaintiff and the members of the proposed class are entitled to declaratory, injunctive, or other equitable relief.

170. Plaintiff's claims are typical of the claims of the proposed class that it seeks to represent, as described above, because they arise from the same course of conduct by Syngenta and are based on the same legal theories. Further, Plaintiff seeks the same forms of relief for itself and the proposed class. Therefore, the "typicality" requirement of Rule 23(a)(3) is satisfied.

171. Because its claims are typical of the proposed class that Plaintiff seeks to represent, Plaintiff has every incentive to pursue those claims vigorously. Plaintiff has no conflicts with, or interests antagonistic to, the grain exporters comprising the proposed class. Plaintiff, an award winning company whose business has nearly been destroyed by Syngenta is committed to the vigorous prosecution of this action, which is reflected in their retention of competent counsel experienced in complex and challenging litigation.

172. Plaintiff's counsel satisfies the requirements of Rule 23(g) to serve as counsel for the proposed class. Plaintiff's counsel has (a) identified and thoroughly investigated the claims set forth herein, are (b) highly experienced in the management and litigation of class actions and complex litigation in general; (c) have extensive knowledge of the applicable law; and (d) possess the resources to commit to the vigorous prosecution of this action on behalf of the proposed class. Accordingly, Plaintiff satisfies the adequacy of representation requirements of Rule 23(a)(4).

173. In addition, this action meets the requirements of Rule 23(b)(2). Syngenta has acted or refused to act on grounds generally applicable to Plaintiff and other members of the proposed class, making final injunctive or corresponding declaratory relief with respect to the proposed class appropriate.

174. This action also meets the requirements of Rule 23(b)(3). Common questions of law or fact, including those set forth above, exist as to the claims of all members of the proposed class and predominate over questions affecting only individual class members, and a class action is superior – if not the only method – for the fair and efficient adjudication of this controversy.

175. Class treatment will permit large numbers of similarly situated grain exporters to prosecute their respective claims in a single forum simultaneously, efficiently, and without the

unnecessary duplication of evidence, effort, and expense that numerous individual actions would produce.

176. This action is manageable as a class action. Notice may be provided to members of the proposed class by first-class mail and through the alternative means, including publication. Further, the claims set forth below based on federal law will apply evenly to all proposed class members. Thus, the superiority and manageability requirements of Rule 23(b)(3) are satisfied.

## **PLAINTIFF'S CLAIMS FOR RELIEF**

### **COUNT I**
### **VIOLATION OF LANHAM ACT – 15 U.S.C. § 1125(a)(1)(B)**

177. Plaintiff incorporates by reference Paragraphs 1-176 as though fully set forth herein.

178. The Lanham Act, 15 U.S.C. § 1125(a), provides in pertinent part:

> (1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—
>
> (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,
>
> shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

179. Syngenta's statements and commentary made to the press, statements on the internet, during quarterly conference calls, and incorporated into Syngenta's forms, which, inter alia, represent Viptera corn is or would imminently be approved for import into China, as alleged above, are materially false statements that are and continue to be likely to cause confusion and mistake as to the nature, characteristics, and qualities of Viptera corn.

180. Syngenta's statements were made as an advertisement for Viptera corn.

181. Syngenta's statements refer specifically to VIPTERA corn.

182. Syngenta had an economic motivation for making its statements – sales of Viptera corn.

183. Syngenta's statements were likely to influence purchasing decisions.

184. Syngenta's statements where widely distributed, which is, at least, sufficient to constitute promotion within the grain industry.

185. Upon information and belief, Plaintiff and class members have relied on Syngenta's material misrepresentations.

186. Plaintiff and class members have and continue to be damaged by Syngenta's material misrepresentations.

187. Plaintiff's and class members' damage was proximately caused by Syngenta's acts.

188. At least, Syngenta has indicated Chinese approval was imminent, when in fact it was not, and Syngenta's "Certificate for Biosafety Certificate(s) Issued By The Chinese Ministry of Agriculture" falsely represents that Viptera corn was approved for import into China.  See, Exhibit B, above.

189. Syngenta's acts constitute the use of false descriptions and false representations in interstate commerce in violation of the § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

## COUNT II
## PUBLIC NUISANCE

190. Plaintiff incorporates by reference Paragraphs 1-189 as though fully set forth herein.

191. Through the conduct alleged above, Syngenta has created a public nuisance by causing widespread contamination of the U.S. corn and DDGS supply with the MIR162 trait.

192. This constitutes an unreasonable and substantial interference with rights common to the general public.

193. This unreasonable interference is imposed on the community at large and on a considerable diverse number of persons and entities. It arises from Syngenta's testing, growing, storing, transporting, selling, disposing, or otherwise disseminating VIPTERA corn: (a) without adequate precautions to prevent contamination of the U.S. corn and corn seed supplies; (b) with the knowledge that VIPTERA corn would contaminate other corn; (c) with the knowledge that this contamination would likely affect the U.S. corn and corn seed supplies; or (d) with the knowledge that there was a substantial risk of contamination of corn and corn seed supplies earmarked for export.

194. Syngenta has unreasonably interfered with the public's right to expect compliance with the federal laws governing the testing, growing, storing, transporting, selling, disposing, or otherwise disseminating VIPTERA corn. Syngenta has further unreasonably interfered with the public's right to expect that the corn sold to the general public is free from contamination with VIPTERA corn as well as the public's right to be notified of whether the corn sold to the public is contaminated with genetically-modified organisms – including corn containing MIR162 – so that the public has the freedom to choose to purchase and consume non-contaminated corn.

195. This interference is unreasonable in that it involves a significant interference with the public health, the public safety, the public peace, the public comfort, or the public convenience. It is also unreasonable in that it is proscribed by law, is of a continuing nature, and has produced a permanent or long-lasting effect.

196. Plaintiff and class members have suffered harm caused by Syngenta's public nuisance distinct from and different than that suffered by the general public in that, as described above, they have suffered business losses in the form of, among other things, the rejection of the crops by certain export markets, namely China; wrongful rescission of sales contracts, reduced or

restricted demand for their products and services in certain markets; and reduced prices for their products and services in markets still utilizing their products and services.

197. In light of the surrounding circumstances, Syngenta knew or should have known that their conduct would naturally or probably result in injuries and damages to the Plaintiff and class members. Nevertheless, Syngenta continued such conduct in reckless disregard of or conscious indifference to those consequences.

## COUNT III
## TRESPASS TO CHATTELS

198. Plaintiff incorporates by reference Paragraphs 1-197 as though fully set forth herein.

199. Plaintiff and class members enter into contracts for the purchase and shipment of goods in the future.

200. Plaintiff enters into many contracts for the purchase of corn and DDGS six months in advance of delivery.

201. Some purchase contracts are entered into a year, or more, in advance of delivery.

202. Syngenta, by testing, growing, storing, transporting, selling, disposing, or otherwise disseminating VIPTERA corn has contaminated the U.S. corn and DDGS supply as described above.

203. MIR162 contamination has negatively impaired the condition, quality, or value of the U.S. corn and DDGS supply.

204. Plaintiff, and, upon information and belief, class members had existing contracts relating to the purchase and shipment of non-MIR162 contaminated corn and DDGS prior to Syngenta's seasonal release of VIPTERA corn.

205. Syngenta's actions, including the testing, growing, storing, transporting, selling, disposing, or otherwise disseminating VIPTERA corn, which led to the market-wide

contamination have harmed Plaintiff's and class members' interests in non-MIR162 contaminated corn.

206. This harm has manifested itself as rejection, or indefinite seizure of shipments of corn and DDGS sent by Plaintiff and class members to Chinese ports.

## COUNT IV
## COMMON LAW NEGLIGENCE

207. Plaintiff incorporates by reference Paragraphs 1-206 as though fully set forth herein.

208. With respect to its testing, growing, storing, transporting, selling, disposing, or otherwise disseminating VIPTERA corn, Syngenta had a duty to utilize its professional expertise and exercise that degree of skill and learning ordinarily used under the same or similar circumstances by a person or entity in Syngenta's business.

209. Syngenta breached this duty by failing to exercise the requisite degree of care in testing, growing, storing, transporting, selling, disposing, or otherwise disseminating VIPTERA corn to prevent it from contaminating the U.S. corn and DDGS supply.

210. Upon information and belief, Syngenta further breached their duty by failing to notify the appropriate regulatory bodies and the public in a timely fashion after it first learned of the contamination of the U.S. corn and DDGS supply with MIR162.

211. The damages incurred by Plaintiff and class members were or should have been foreseen by Syngenta as Syngenta understood the risks of releasing VIPTERA corn, including but not limited to, the near certainty of cross-pollination, risks of intentional or unintentional commingling of VIPTERA corn with non-VIPTERA corn, China's zero-tolerance policy for MIR162, and China's large, and growing, U.S. corn and DDGS import market.

212. Syngenta breached its duties, as alleged above, breached the requisite standard of care owed to all foreseeable plaintiffs, and was therefore negligent.

213. Syngenta's breaches are a direct and proximate cause of the injuries and damages sustained by the Plaintiff and class members.

## COUNT V
## STRICT LIABILITY – PRODUCTS LIABILITY

214. Plaintiff incorporates by reference Paragraphs 1-213 as though fully set forth herein.

215. Syngenta was and continues to be a supplier of VIPTERA corn.

216. Syngenta has in the past and continues to manufacture, sell, or otherwise distribute VIPTERA corn.

217. VIPTERA corn was used in a manner reasonably anticipated.

218. As a direct and proximate result of the defective and unreasonably dangerous condition of VIPTERA corn as it existed when Syngenta supplied it, the Plaintiff and class members have sustained injuries and damages as alleged above.

219. In light of the surrounding circumstances, Syngenta knew or should have known that their conduct would naturally or probably result in injuries and damages to the Plaintiff and class members.

220. Syngenta's VIPTERA corn is the direct and proximate cause of the injuries and damages sustained by the Plaintiff and class members.

221. Nevertheless, Syngenta continued such conduct in reckless disregard of conscious indifference to those consequences.

## COUNT VI
## STRICT LIABILITY – ULTRAHAZARDOUS OR
## ABNORMALLY DANGEROUS ACTIVITY

222. Plaintiff incorporates by reference Paragraphs 1-221 as though fully set forth herein.

223. Syngenta's testing, growing, storing, transporting, selling, disposing, or otherwise disseminating VIPTERA corn constituted and continues to constitute an abnormally dangerous or

ultrahazardous activity because such activities create a high degree of risk of harm, the harm has been and will continue to be significant, the risk cannot be eliminated by the exercise of reasonable care, the value to the community is outweighed by its dangerous attributes, and the activity resulted in injuries and damages to the Plaintiff and class members.

224. In addition, the activity was unduly dangerous and inappropriate for the places where it was conducted.

225. The type of harm suffered by the Plaintiff and class members is the kind of harm, or the possibility of such harm, which makes the activity abnormally dangerous.

226. As a direct and proximate result of Syngenta's ultrahazardous or abnormally dangerous activities, the Plaintiff and class members have sustained, and will continue to sustain substantial injuries and damages, including those alleged above.

227. Syngenta is therefore strictly liable to the Plaintiff and class members for all damages which have resulted or will result from their abnormally dangerous activities with respect to their testing, growing, storing, transporting, selling, disposing, or otherwise disseminating VIPTERA corn.

228. In light of the surrounding circumstances, Syngenta knew or should have known that their conduct would naturally or probably result in injuries to the Plaintiff and class members.

229. Nevertheless, Syngenta continued such conduct in reckless disregard of or conscious indifference to those consequences.

## COUNT VII
## STRICT LIABILITY – FAILURE TO WARN

230. Plaintiff incorporates by reference Paragraphs 1-229 as though fully set forth herein.

231. Syngenta is strictly liable to the Plaintiff and class members as a result of its failure to warn about the dangers of planting, growing, harvesting, transporting, or otherwise utilizing VIPTERA corn.

232. Syngenta sold VIPTERA corn in the course of its business, as alleged above.

233. When planted, grown, harvested, transported or otherwise utilized as reasonably anticipated and without knowledge of its characteristics, VIPTERA corn was unreasonably dangerous at the time of its sale.

234. Syngenta did not give an adequate warning of the danger of planting, growing, harvesting, transporting, or otherwise utilizing VIPTERA corn.

235. Upon information and belief, VIPTERA corn was used in a reasonably anticipated manner.

236. Plaintiff and class members suffered injury and damages as a direct and proximate result of Syngenta's failure to provide an adequate warning regarding the dangers of planting, growing, harvesting, transporting, or otherwise utilizing VIPTERA corn at the time VIPTERA corn was sold.

237. In light of the surrounding circumstances, Syngenta knew or should have known that their conduct would naturally or probably result in injuries to the Plaintiff and class members.

238. Nevertheless, Syngenta continued such conduct in reckless disregard of or conscious indifference to those consequences.

**COUNT VIII**
**NEGLIGENT INTERFERENCE WITH PROSPECTIVE**
**ECONOMIC RELATIONS UNDER CALIFORNIA LAW**

239. Plaintiff incorporates by reference Paragraphs 1-238 as though fully set forth herein.

240. Plaintiff and class members, throughout the relevant time period entered into or would have entered into many economic relationships that likely would have resulted in a future economic benefit to Plaintiff and class members.

241. Plaintiff negotiated and entered into many contracts in California. The beginning of Plaintiff's performance often began in California.

242. Syngenta knew or should have known about of these relationships.

243. At least, employees in Plaintiffs' California branch office contact Syngenta representatives to request BioSafety Certificates, which are needed for importation of corn and DDGS into China. Again, as set forth above, the Syngenta BioSafety Certificate Request Form misrepresents the approval and import certification of MIR162.

244. Syngenta knew or should have known that these relationships would be disrupted if Syngenta failed to act with reasonable care.

245. At least, during Syngenta's first quarter 2014 earnings conference call, CEO Michael Mack stated "if and where there is any financial exposure from a rejection, that's between the two parties, the importer and the exporter of corn." Exhibit R.

246. Syngenta failed to act in accordance with its professional expertise and exercise that degree of skill and learning ordinarily used under the same or similar circumstances by a person or entity in Syngenta's business.

247. Syngenta engaged in wrongful conduct by releasing VIPTERA corn when it knew that contamination through commingling and cross-pollination was impossible to prevent.

248. Syngenta engaged in wrongful conduct by misrepresenting the status of Chinese regulatory approval of VIPTERA corn.

249.  Due to Syngenta's release of VIPTERA corn, and the resulting contamination of the U.S. corn and DDGS supply, Plaintiff's economic relations were disrupted by, at least, Chinese purchasers of U.S. corn and DDGS rescinding purchase contracts.

250.  Plaintiff and class members have been and continue to be harmed by the rescission of purchase and shipment contracts.

251.  Syngenta's wrongful conduct was a substantial factor in causing Plaintiff's and class members' harm.

252.  But for Syngenta's release of VIPTERA corn, the MIR162 trait would not contaminated the U.S. corn and DDGS supply which ultimately lead to the ruin of the Chinese import market.

## COUNT IX
## FRAUDULENT MISREPRESENTATION

253.  Plaintiff incorporates by reference Paragraphs 1-252 as though fully set forth herein.

254.  Syngenta's statements regarding and relating to the status of Chinese regulatory approval of VIPTERA corn were made fraudulently.

255.  Syngenta's statements, as alleged above, where made without a sufficient basis for the representations that were stated or implied.

256.  The statements, as alleged above, were made for the purpose of inducing those in the corn industry, including Plaintiff and class members, to act upon the purported impending approval of VIPTERA corn for import into China.

257.  Syngenta knew or had reason to know that its statements were likely to be regarded as important in determining future actions taken with respect to VIPTERA corn.

258.  Additionally, a reasonable person would attach importance to the existence or nonexistence of Chinese regulatory approval in determining his choice of action.

259.  Plaintiff and class members reliance Syngenta's statements were justified.

260.  Plaintiff and class members' justified reliance was a substantial factor in determining actions taken with respect to VIPTERA corn.

261.  As a direct and proximate result of Syngenta's fraudulent statements Plaintiff and class members have suffered and will continue to suffer damages.

## PRAYER FOR RELIEF

Plaintiff, on behalf of itself and all others similarly situated, requests:

A.  Entry of preliminary and permanent injunctions providing that Syngenta shall be enjoined from selling, marketing, distributing, or otherwise disseminating VIPTERA corn and DURACADE corn, in addition to any other product featuring MIR162 until such time as MIR162 has been approved for import to China;

B.  Entry of judgment ordering Syngenta to take affirmative steps to remediate the contamination that it has already caused;

C.  Entry of judgment finding:

    i.  Syngenta falsely advertised VIPTERA corn under § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

    ii.  Syngenta's release of VIPTERA corn constitutes a public nuisance;

    iii.  Syngenta's release of VIPTERA corn and contamination of the U.S. corn supply constitutes a trespass to chattels;

    iv.  Syngenta's release of VIPTERA corn was negligent;

    v.  Syngenta is strictly liable for damages done by the release of VIPTERA corn;

    vi.  Syngenta negligently interfered with Plaintiff's prospective economic business relations.

       vii.   Syngenta fraudulently misrepresented the approval status of Viptera

           corn; and

   D.  Monetary damages including compensatory relief to which Plaintiff and the

      proposed class members are entitled and will be entitled at the time of trial, in an

      amount exceeding $75,000;

   E.  Prejudgment interest;

   F.  The costs of this action; and

   G.  Such other and further relief as the Court deems proper.

## **DEMAND FOR JURY TRIAL**

Plaintiff hereby requests that all issues be determined by jury.

Respectfully submitted,

Plaintiff Trans Coastal Supply Company, Inc.

By its attorneys,
SIMMONS HANLY CONROY

Dated: September 12, 2014       By:  _/s/ *Paul A. Lesko*_____
Paul A. Lesko – IL Bar No. 6288806
One Court Street
Alton, IL 62002
Ph: 618,259,2222
Fax: 618.259.2251
Email: plesko@simmonsfirm.com