## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| *IN RE SYNGENTA AG MIR 162 CORN LITIGATION* | Case No. 14-cv-02637-JWL-JPO |
| THIS DOCUMENT RELATES TO: | |
| *Trans Coastal Supply Company, Inc.  v. Syngenta AG* No. 14-cv-02637-JWL-JPO | |

## MEMORANDUM IN SUPPORT OF SYNGENTA'S
## MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

Page(s)

INTRODUCTION .......................................................................................................... 1

STATEMENT OF UNDISPUTED MATERIAL FACTS ........................................... 3

I.    VIPTERA ........................................................................................................... 3

II.   DURACADE ...................................................................................................... 6

      A.    Event 5307 Approval Process In The United States. ........................ 6

III.  TRANS COASTAL'S CORPORATE STRUCTURE AND EXPORT
      BUSINESS ......................................................................................................... 7

      A.    Trans Coastal's Operations In California. ......................................... 8

      B.    Trans Coastal's Line Of Credit And Bankruptcy. ......................... 10

IV.   TRANS COASTAL'S SALES OF U.S. CORN AND DDGS TO
      CHINA AND CHINA AS A MARKET FOR TRANS COASTAL'S
      SALE OF U.S. CORN AND DDGS .............................................................. 11

V.    TRANS COASTAL'S AWARENESS THAT IT WAS SHIPPING U.S.
      CORN AND DDGS TO CHINA WITH UNAPPROVED GM
      EVENTS ........................................................................................................... 13

      A.    Trans Coastal's Knowledge That MIR162 Was Not Approved
            For Import To China And China's Rejections Citing MIR162
            In 2013. ................................................................................................. 13

      B.    Trans Coastal's Risk Term In Contracts For The Sale Of U.S.
            DDGS To China. ................................................................................... 15

      C.    Trans Coastal's Knowledge That MIR162 Was Still Not
            Approved In China In 2014. ................................................................ 16

VI.   TRANS COASTAL'S SHIPMENTS OF U.S. CORN AND DDGS IN
      LATE 2013 AND THROUGH 2014 .............................................................. 17

      A.    Purported Misrepresentations. ........................................................... 17

      B.    Trans Coastal's Late 2013 And Through 2014 Contracts And
            Shipments Of U.S. Corn And DDGS To China. ............................... 19

VII.  TRANS COASTAL'S PURPORTED DAMAGES ....................................... 20

VIII. BRIBERY AND "UNDER THE TABLE" PAYMENTS IN TRANS COASTAL'S SALES TO CHINA ...................... 23

STATEMENT OF QUESTIONS PRESENTED ...................................... 24

LEGAL STANDARD ............................................................................ 26

ARGUMENT ........................................................................................ 27

   I. TRANS COASTAL'S LANHAM ACT CLAIM FAILS AS A MATTER OF LAW. .................................................... 27

   II. TRANS COASTAL'S NEGLIGENCE CLAIM FAILS AS A MATTER OF LAW. .................................................... 29

      A. Trans Coastal's Negligence Claim Fails Under The Economic Loss Doctrine. .......................................... 29

      B. Trans Coastal's Negligence Claim Fails As A Matter Of Law Because Syngenta's Conduct Was Not The Proximate Cause Of Trans Coastal's Damages. ............................. 37

   III. THE COURT SHOULD GRANT SUMMARY JUDGMENT DISMISSING TRANS COASTAL'S FRAUDULENT MISREPRESENTATION CLAIM. ...................................... 40

      A. Trans Coastal Cannot Show That Syngenta Made A False Statement Of Material Fact To It. ............................. 40

      B. Trans Coastal Cannot Show That It Actually And Justifiably Relied On Syngenta's Alleged Misstatements. ............. 42

      C. Trans Coastal Cannot Show That Syngenta Knew Or Believed That Any Alleged False Statement Was False When Syngenta Made It. .................................................... 44

   V. TRANS COASTAL CANNOT PROVE DAMAGES ATTRIBUTABLE TO SYNGENTA. ..................................... 48

      A. Trans Coastal's Lost Profits Claim Fails Because Illinois And California Law Preclude The Recovery Of Speculative Damages. ........................................................ 49

      B. Trans Coastal Cannot Recover Damages Because It Does Not And Cannot Distinguish Between Losses Purportedly Attributable To Syngenta Or MIR162 As Opposed To Other Causes. ............................................................. 53

**C.** **Trans Coastal's $5.5 Million Claim For Washouts Is Speculative And Arbitrary.**.................................................. 55

**D.** **Trans Coastal Cannot Recover Damages For Bribes Paid To Chinese Officials**.......................................................... 56

**CONCLUSION** ................................................................................................ 57

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*766347 Ontario Ltd. v. Zurich Capital Mkts, Inc.*,
   249 F. Supp. 2d 974 (N.D. Ill. 2003) ..........................................................................2, 34, 45

*Abrams v. City of Chicago*,
   811 N.E. 2d 670 (Ill. 2004) ...........................................................................................37

*Adams v. Am. Guar. & Liab. Ins. Co.*,
   233 F.3d 1242 (10th Cir. 2000) ....................................................................................26

*All. Mortg. Co. v. Rothwell*,
   10 Cal. 4th 1226 (Cal. 1995) ........................................................................................43

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986) ......................................................................................................26

*Berke v. Manilow*,
   63 N.E.3d 194 (Ill. App. Ct. 2016) ..............................................................................37

*Biakanja v. Irving*,
   49 Cal. 2d 647 (Cal. 1958) ...........................................................................................35

*Bily v. Arthur Young & Co.*,
   3 Cal. 4th 370 (Cal. 1992) ............................................................................................36

*Bonhomme v. St. James*,
   970 N.E.2d 1 (Ill. 2012) ...............................................................................................44

*Brosnan v. Tradeline Sols., Inc.*,
   681 F. Supp. 2d 1094 (N.D. Cal. 2010) .......................................................................44

*Bruner v. Baker*,
   506 F.3d 1021 (10th Cir. 2007) ....................................................................................27

*Carney v. City & Cty. of Denver*,
   534 F.3d 1269 (10th Cir. 2008) ....................................................................................27

*Carruthers v. Flaum*,
   365 F. Supp. 2d 448 (S.D.N.Y. 2005) .........................................................................56

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986) ......................................................................................................27

*In re Chicago Flood Litig.*,
   680 N.E. 2d 265, 274 (Ill. 1997) ..........................................................30, 31, 35

*Conroy v. Regents of Univ. of Cal.*,
   45 Cal. 4th 1244 (Cal. 2009) ........................................................................39, 42

*Constance B. v. State of California*,
   178 Cal. App. 3d 200 (Cal. Ct. App. 1986) .................................................37

*Cty. of Santa Clara v. Atl. Richfield Co.*,
   137 Cal. App. 4th 292 (Cal. Ct. App. 2006) ................................................35

*Daubert v. Merrell Dow Pharm., Inc.*,
   509 U.S. 579 (1994) ...............................................................................2, 48, 49

*Della Penna v. Toyota Motor Sales U.S.A., Inc.*,
   902 P.2d 740 (Cal. 1995) .............................................................................46, 47

*Drs. Sellke & Conlon, Ltd. v. Twin Oaks Realty, Inc.*,
   491 N.E.2d 912 (Ill. App. Ct. 1986) ...........................................................50

*Electronic Funds Solutions, LLC v. Murphy*,
   134 Cal. App. 4th 1161 (Cal. Ct. App. 2005) ..............................................48

*Engalla v. Permanente Med. Grp., Inc.*,
   15 Cal. 4th 951 (Cal. 1997) .........................................................................42

*Fed. Ins. Co. v. J.K. Mfg. Co.*,
   933 F. Supp. 2d 1065 (N.D. Ill. 2013) .........................................................33

*Fisherman Surgical Instruments, LLC v. Tri-anim Health Servs., Inc.*,
   502 F. Supp. 2d 1170 (D. Kan. 2007) .........................................................48

*In re Fluidmaster, Inc.*,
   No. 14-cv-5696, 2017 WL 1196990 (N.D. Ill. Mar. 31, 2017) ..............34

*Frustuck v. City of Fairfax*,
   212 Cal. App. 2d 345 (Cal. Ct. App. 1963) .................................................53

*Gen. Steel Domestic Sales, LLC v. Chumley*,
   627 F. App'x 682 (10th Cir. 2015) ...............................................................28

*Graham v. Bank of Am., N.A.*,
   226 Cal. App. 4th 594 (Cal. Ct. App. 2014) ................................................42

*Greenwich S.F., LLC v. Wong*,
   190 Cal. App. 4th 739 (Cal. Ct. App. 2010) ................................................49

*Grotheer v. Escape Adventures, Inc.*,
14 Cal. App. 5th (Cal. Ct. App. 2017) ................................................................37

*Guido v. Koopman*,
1 Cal. App. 4th 837 (Cal. Ct. App. 1991) ...........................................................43

*Harbor House Condo. Ass'n v. Mass. Bay Ins. Co.*,
703 F. Supp. 1313 (N.D. Ill. 1988) .....................................................................53

*Hardscrabble Ranch, L.L.C. v. United States*,
840 F.3d 1216 (10th Cir. 2016) ..........................................................................26

*Hecktman v. Pac. Indem. Co.*,
59 N.E.3d 868 (Ill. App. Ct. 1st Dist. 2016) ......................................................31

*Hellenic Petroleum, LLC v. Sacramento Energy Res., LLC*,
No. 1:19-CV-0491 AWI SAB, 2019 WL 4747794 (E.D. Cal. Sept. 30, 2019)......46

*Holmes v. Sec. Inv'r Prot. Corp.*,
503 U.S. 258 (1992)............................................................................................37

*Ill. Non-Profit Risk Mgmt. Ass'n v. Human Serv. Center of S. Metro-East*,
884 N.E.2d 700 (Ill. App. Ct. 2008) ...................................................................42

*Intermountain Stroke Ctr., Inc. v. Intermountain Health Care*,
638 F. App'x 778 (10th Cir. 2016) .....................................................................28

*J'Aire Corp. v. Gregory*,
598 P.2d 60 (Cal. 1979) .....................................................................................35

*Johnson v. Utopia Tours, Inc.*,
No. 2–12–0024, 2012 WL 6969136 (Ill. App. Ct. Nov. 6, 2012)....................37, 39

*Kaul v. Stephan*,
83 F.3d 1208 (10th Cir. 1996) ............................................................................26

*Kids' Universe v. In2Labs*,
95 Cal. App. 4th 870 (Cal. Ct. App. 2002) ...............................................49, 50, 51

*Kopley Grp. V., L.P. v. Sheridan Edgewater Props., Ltd.*,
879 N.E.2d 218 (Ill. App. Ct. 2007) ....................................................33, 34, 39, 43

*Korea Supply Co. v. Lockheed Martin Corp.*,
29 Cal. 4th 1134 (Cal. 2003)..............................................................................46

*LiMandri v. Judkins*,
52 Cal. App. 4th 326 (Cal. Ct. App. 1997) .........................................................45

*Manneh v. Iverness Med. Innovations, Inc.*,
   No. 08CV653 WQH AJB, 2009 WL 4642390 (S.D. Cal. Dec. 1, 2009) .........................52, 54

*Martinez v. CO2 Servs., Inc.*,
   12 F. App'x 689 (10th Cir. 2001) .........................................................................................26

*Metro. Water Reclamation Dist. of Greater Chicago v. Terra Found. for Am. Art*,
   13 N.E.3d 44 (Ill. App. Ct. 2014) ..................................................................................30, 31

*Midland Hotel Corp. v. Reuben H. Donnelly Corp.*,
   515 N.E.2d 61 (Ill. 1987) ......................................................................................................52

*Nat. Soda Prod. Co. v. City of Los Angeles*,
   23 Cal. 2d 193 (1943) ............................................................................................................49

*Nat'l Credit Union Admin. Bd. v. UBS Sec., LLC*,
   Nos. 12-2591-JWL & 12-2648-JWL, 2016 WL 7373857 (D. Kan. Dec. 20,
   2016) .......................................................................................................................................27

*Neptuno Reuhand-Und Verwaltungsgesellschaft Mbh v. Arbor*,
   692 N.E.2d 812 (Ill. App. Ct. 1998) .....................................................................................45

*Otis v. Doctor's Assocs.*,
   No. 94 C 4227, 1998 WL 673595 (N.D. Ill. Sept. 14, 1998)..................................................51

*Parlour Enters., Inc. v. Kirin Grp., Inc.*,
   152 Cal. App. 4th 281 (Cal. Ct. App. 2007) .........................................................................51

*Perfection Corp. v. Lochinvar Corp.*,
   812 N.E.2d 465 (Ill. App. Ct. 2004) .....................................................................................55

*Pisano v. Am. Leasing*,
   146 Cal. App. 3d. 194 (Cal. Ct. App. 1983) .........................................................................47

*R Power Biofuels, LLC v. Chemex LLC*,
   No. 16-CV-00716-LHK, 2016 WL 6663002 (N.D. Cal. Nov. 11, 2016)...............................47

*Real Estate Value Co. v. USAir, Inc.*,
   979 F. Supp. 731 (N.D. Ill. 1997) ....................................................................................48, 51

*Receivership Mgmt., Inc. v. AEU Holdings, LLC*,
   No. 18 C 8167, 2019 WL 4189466 (N.D. Ill. Sept. 4, 2019)..................................................30

*Redarowicz v. Ohlendorf*,
   441 N.E.2d 324 (Ill. 1982)......................................................................................................31

*Redfearn v. Trader Joe's Co.*,
   20 Cal. App. 5th 989 (Cal. Ct. App. 2d Dist. 2018) .............................................................46

*Rheumatology Diagnostics Lab., Inc. v. Aetna, Inc.*,
    No. 12–cv–05847–WHO, 2015 WL 1744330 (N.D. Cal. Apr. 15, 2015) .............................55

*S. Cal. Gas Leak Cases*,
    7 Cal. 5th 391 (Cal. 2019) ...........................................................................32, 35, 36

*S. Pac. Co. v. Darnell-Tzenzer Lumber Co.*,
    245 U.S. 531 (1918) ...........................................................................................37

*Sargon Enters., Inc. v. Univ. of S. Cal.*,
    55 Cal. 4th 747 (2012) .......................................................................................50

*Schrimsher v. Bryson*,
    58 Cal. App. 3d 660 (Cal. Ct. App. 1976) ..............................................................37

*In re Soybean Futures Litig.*,
    892 F. Supp. 1025 (N.D. Ill. 1995) .............................................................41, 42, 54

*In re Syngenta AG MIR 162 Corn Litig.*,
    131 F. Supp. 3d 1177 (D. Kan. 2015) ............................................................ *passim*

*In re Syngenta Mass Tort Actions*,
    No. 3:15-cv-01121-DRH, 2017 WL 713694 (S.D. Ill. Feb. 20, 2017) ...............................31

*TAS Distrib. Co. v. Cummins Engine Co.*,
    491 F.3d 625 (7th Cir. 2007) ...............................................................................49

*Thompson v. County of Cook*,
    609 N.E.2d 290 (Ill. 1993) ...................................................................................53

*Trans States Airlines v. Pratt & Whitney Canada, Inc.*,
    682 N.E.2d 45 (Ill. 1997) .....................................................................................32

*In re Verifone Sec. Litig.*,
    784 F. Supp. 1471 (N.D. Cal. 1992) ......................................................................42

*Water Inc. v. Everpure, Inc.*,
    CV 09-3389 ABC (SSx), 2011 WL 13174224 (W.D. Cal. Dec. 19, 2011) ..........................47

*Westside Center Assocs. v. Safeway Stores 23, Inc.*,
    42 Cal. App. 4th 507 (Cal. Ct. App. 1996) .............................................................46

## Rules

Fed. R. Civ. P. 56(a) ...................................................................................................26

## <u>INTRODUCTION</u>

Trans Coastal Supply Company's remaining claims for violations of the Lanham Act, negligence, fraudulent misrepresentation, and negligent interference with prospective economic advantage cannot survive summary judgment for multiple, independent reasons.

*First*, Trans Coastal's Lanham Act claims—premised on Syngenta's biosafety certificate request form, the "Plant With Confidence" Fact Sheet, and a 2011 letter sent by Chuck Lee of Syngenta—fail for the reasons the Court recognized in dismissing materially identical claims brought by producer and non-producer plaintiffs throughout the overall Viptera litigation. There is no reason for the Court to depart from its previous rulings here.

*Second*, Trans Coastal's negligence-based claims fail because—based on the record developed in this case—Trans Coastal cannot establish that Syngenta owed it any duty to protect against its claimed economic losses.

*Third*, Trans Coastal's claims would fail in any event because Trans Coastal cannot demonstrate proximate causation. The undisputed evidence shows that any alleged damages resulted from Trans Coastal's voluntary business decision to ship U.S. corn and DDGS containing MIR162 to China, even though MIR162 had not yet been approved for import in China. Indeed, Trans Coastal seeks damages for contracts it entered into many months *after* China began rejecting U.S. corn shipments in November 2013. Trans Coastal's voluntary decision to ship despite the known risks of rejection, among other factors, breaks the required causal nexus between Syngenta's purported misconduct and Trans Coastal's alleged harm.

*Fourth*, Trans Coastal's fraudulent misrepresentation claims based on Syngenta's predictions about the timing of Chinese approval fail because Trans Coastal cannot show that Syngenta made a false statement of material fact, much less that Trans Coastal actually and justifiably relied on those statements. Indeed, Trans Coastal's President and corporate

representative testified that it would be "*an impossibility*" to identify the alleged false statements Trans Coastal purports to have relied on, and that she "can't tell you that I did or I didn't" rely on any statement by Syngenta in making its sales decisions. And even if Trans Coastal did rely on the alleged misrepresentations, that reliance would not be justified because "once Spring 2012 passed without Chinese approval of MIR162, the July 2011 and January 2012 representations had been proved false, and [an exporter] could no longer rely reasonably on those representations." *In re Syngenta AG MIR 162 Corn Litig.*, No. 14-MD-2591-JWL, 2018 WL 489098, at *8-9 (D. Kan. Jan. 19, 2018) ("LDC MTD Order").

*Fifth*, if Illinois law applies, the Court should dismiss Trans Coastal's claim for negligent interference because the cause of action does not exist there. *See 766347 Ontario Ltd. v. Zurich Capital Mkts, Inc.*, 249 F. Supp. 2d 974, 992 (N.D. Ill. 2003). If the Court instead applies California law, the claim fails as a matter of law because the record refutes any reasonably probable expectation of specific business with identifiable Chinese buyers of U.S. corn and DDGS. Trans Coastal had no history of steady DDGS sales, and the undisputed record reveals that its sales fluctuated wildly year-to-year. Nor can Trans Coastal show that Syngenta had knowledge of Trans Coastal's relationships with Chinese buyers or knowledge that its decision to commercialize MIR162 would affect those relationships.

*Finally*, Trans Coastal has not established and cannot establish a viable basis for damages. As an initial matter, Trans Coastal relies on the testimony of a damages expert (James Woods) who should be excluded under Rule 702 and *Daubert*. Trans Coastal's damages claims also cannot survive both because they are based on unsubstantiated projections and conjecture, and because Trans Coastal has not attempted to prove which of its alleged losses were caused by Syngenta's commercialization of MIR162, as opposed to other factors. Trans Coastal seeks to hold Syngenta

responsible for *all* losses across every aspect of Trans Coastal's business around the world—regardless of whether the alleged losses relate to shipping corn or DDGS to China.

The Court accordingly should grant summary judgment in Syngenta's favor.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

### I.  VIPTERA

1. On or about August 31, 2007, Syngenta submitted a Petition for Determination of Nonregulated Status for Insect-Resistant MIR162 Maize to the United States Department of Agriculture ("USDA"). *See* Ex. 1 (C. Quain Dep. Ex. 20).

2. MIR162 is a transgenic corn event containing the Vip3a protein. *See id.*

3. The USDA deregulated MIR162 in April 2010 without restrictions on its usage or sale. *See* Ex. 2 (NEPA Decision & Finding of No Significant Impact: MIR162 Maize (Apr. 12, 2010); Ex. 3 (USDA Animal & Plant Health Inspection Service, *Syngenta Biotechnology, Inc.; Determination of Nonregulated Status for Corn Genetically Engineered for Insect Resistance*, Docket No. APHIS-2009-0072, 75 Fed. Reg. 20560-01 (Apr. 12, 2010)).

4. The EPA registered MIR162 as a pesticide with no restrictions on sale on November 26, 2008. *See* Ex. 4 (EPA, *Notice of Pesticide Registration, MIR162 Maize* (Nov. 26, 2008)).

5. On December 1, 2008, the FDA stated that it "consider[ed] Syngenta's consultation on maize event MIR162 to be complete," and that "food and feed derived from . . . MIR162 are as safe and nutritious as food and feed derived from conventional maize." Ex. 5 (FDA, Biotechnology Consultation Note to the File BNF No. 000113, Maize Event MIR162 (Dec. 1, 2008)).

6. In March 2010, the USDA's Final Environmental Assessment for MIR162 included the statement that "MIR162 corn would have no significant impacts on human or animal health,"

other than on the corn insect pests that it is designed to control. Ex. 6 (USDA, Final Environmental Assessment: Syngenta Biotechnology, Inc. Insect Resistant MIR162 Corn, No. SYN-IR162, at 17 (Mar. 2010)).

7. The USDA's Final Environmental Assessment also included the statement that "[t]here [are] no human health concerns with respect to toxicity or allergenicity and no unreasonable environmental concerns with respect to toxicity of the insecticidal proteins expressed in the MIR162 corn." *Id*. at 32.

8. Syngenta first sold corn seeds containing MIR162 to U.S. farmers as part of its Agrisure Viptera ("Viptera") product line. *See, e.g.*, Ex. 7 ("Syngenta Receives Approval for Breakthrough Corn Trait Technology in the U.S.," https://www.prnewswire.com/news-releases/syngenta-receives-approval-for-breakthrough-corn-trait-technology-in-the-us-91675584.html.).

9. There are a number of different Viptera corn seed products and each Viptera product contains multiple transgenic events, including MIR162, which are stacked or pyramided together. *See, e.g.*, Ex. 8 (D. Martin Dep. Ex. 200 (Tab 8)); Ex. 9 (1/29/2016 D. Martin Dep. Tr. 38:24-39:11).

10. Syngenta first began accepting orders in the United States for commercial sales of Viptera corn seed in the late summer to fall 2010. *See* Ex. 10 (3/8/2016 C. Lee Dep. Tr. 89:15-17); *see also* ECF No. 451 (NPP Am. Compl.) ¶¶ 61-62.

11. Syngenta's first shipments of Viptera corn seed to commercial purchasers in the United States were in November and December 2010. *See* Ex. 10 (3/8/2016 C. Lee Dep. Tr. at 25:18-26:5); *see also* ECF No. 451 (NPP Am. Compl.) ¶¶ 61-62.

12.     There were no restrictions by U.S. regulatory agencies on the sale of corn seeds containing MIR162 at the time Syngenta began selling Viptera in the U.S.  *See supra* SOF ¶¶ 3-7.

13.     MIR162 received importation approval from China in December 2014.  *See* Ex. 11 (3/24/2016 Y. Zhang Dep. Tr. 571:22-572:2).

14.     Syngenta sold 540,000 units of Viptera seed for planting in 2011.  *See* Ex. 12 (C. Lee Dep. Ex. 520).  Over 1.2 million acres of Viptera were planted in 2011.  *See* Ex. 13 (J. Wheeler Dep. Ex. 679).  Approximately 250 million bushels of corn were grown from Viptera in 2011.  *See* Ex. 14 (J. Bernens Dep Ex. 1015 (SYNG_00013493)).

15.     By the time Syngenta commercialized Viptera, Syngenta had spent over $100 million on the development of MIR162.  *See* Ex. 15 (O'Reilly Dep. Ex. 2024).

16.     Syngenta's expert Phillip Shull stated in his report that in March 2010, "a company could submit its initial application, final dossier, and responses to any questions from the MOA at only three designated times during the year."  Ex. 16 (12/22/2016 P. Shull Rpt. ¶ 100).

17.     Mr. Shull's report also stated that when Syngenta submitted its application to China for MIR162 import approval in March 2010, "biotech companies could reasonably expect their import applications to be approved approximately 24 months after submitting the initial dossier to the MOA."  *Id*. ¶ 125.

18.     Syngenta's Chuck Lee testified that "up until this point, you know, we put a fair amount of its traits through China, and they had operated on this two-year time frame from USDA deregulation 'til approval. . . . [W]e really hadn't had issues before, and nor had really any of the other companies had any real issues, so we fully expected that this time line would execute."  Ex. 10 (3/8/2016 C. Lee Dep. Tr. 189:22-190:11); *see also id*. at 177:19-178:11 ("[S]o we expected-- regulatory said they expected that to occur").

## II.    DURACADE

### A.    Event 5307 Approval Process In The United States.

19.    On or about November 30, 2010, Syngenta submitted a Petition for Determination of Nonregulated Status for Event 5307 Corn ("Duracade") to the USDA.  *See* Ex 17 (C. Quain Dep. Ex. 21).

20.    Event 5307 is a transgenic corn event containing the eCry3.1Ab protein.  *See id.*

21.    The USDA deregulated Event 5307 in January 2013 without restrictions on its usage or sale.  *See* Ex. 18 (NEPA Decision & Finding of No Significant Impact:  Event 5307 Maize (Jan. 29, 2013)).

22.    The EPA registered Event 5307 as a pesticide with no restrictions on sale in July 2012.  *See* Ex. 19 (EPA, Notice of Pesticide Registration, 5307 Corn (July 31, 2012)).

23.    On January 30, 2012, the FDA stated that it considered Syngenta's consultation on Event 5307 to be complete, and that "foods and feeds derived from [Event 5307] are not materially different in composition, safety, or any other relevant parameter from other corn varieties . . . in the U.S."  Ex. 20 (FDA, Biotechnology Consultation Note to the File BNF No. 000128, Maize Event 5307 (Jan. 30, 2012)).

24.    Syngenta first sold corn seeds containing Event 5307 to U.S. farmers as part of its Agrisure Duracade product line.  *See, e.g.*, Ex. 21 ("USDA Approves New Agrisure Duracade Trait                               From                               Syngenta," http://www.plantmanagementnetwork.org/pub/php/news/2013/AgrisureDuracade/).

25.    Duracade was first sold to U.S. farmers in 2013 for planting in the spring 2014.  *See* ECF No. 4263 (Pretrial Order, 2. Stipulations ¶ 26).

26. There were no restrictions by U.S. regulatory agencies on the sale of corn seeds containing Event 5307 at the time Syngenta began selling Duracade in the U.S. *See supra* SOF ¶¶ 21-25.

27. Event 5307 received importation approval from China in July 2017. *See* Ex. 22 (10/26/2017 Y. Zhang Dep. Tr. 367:7-9).

## III. TRANS COASTAL'S CORPORATE STRUCTURE AND EXPORT BUSINESS

28. Among other commodities, during the period 2010 through at least 2016, Trans Coastal was "engaged in the business of buying and exporting corn and corn [by-]products." *See* ECF No. 4263 (Pretrial Order, at 2. Stipulations ¶ 1).

29. Trans Coastal also exported soybeans, soybean meal, and corn gluten meal. *See* Ex. 23 (10/17/2016 J. Woods Rpt. at 4) (citing http://www.transcoastalsupply.com/).

30. Trans Coastal exported commodities in containers, rather than in bulk vessels. ECF No. 2530 (NPP's Third Am. Compl ¶ 341) (alleging that Trans Coastal "was started to fulfill a niche in the market - the purchase and shipment of grains in containers that must be returned abroad, as opposed to loading cargo vessels solely for the purpose of grain shipment. The container export market deals in export quantities much smaller than that of the vessel export market.").

31. Trans Coastal's role was as a "middleman" which bought grains and products from a supplier, put them in containers, and purchased ocean freight to a customer in the grain or products' final destination. *See* Ex. 24 (4/7/2016 P. Moses 30(b)(6) Dep. Tr. 110:24-111:9).

32. According to Trans Coastal's documents, during the period 2011 to 2014, less than half of Trans Coastal's overall volume directed to Asian markets was destined for China. *See* Ex. 25 (Q. Mimms Rpt. at 11) (*citing* TCSC000000123; TCS000000122; TCS00663247; TCS00775952).

33. According to Trans Coastal's documents, DDGS comprised approximately 60.8% of Trans Coastal's sales volume to China between 2011 and 2014. *See* Exs. 26-29 (TCSC00000123; TCSC00000122; TCSC00663247; TCSC00775952).

34. Trans Coastal's overall profit margins between 2010 and 2013 ranged from 0.06% and 0.99%. *See* Ex. 25 (1/13/2017 Q. Mimms Rpt. at 37); Ex. 30 (TCSC00000001-119).

35. Trans Coastal's profit margins between 2010 and 2013 on the sale of DDGS, in turn, ranged from 0.53% to 2.65%, with a weighted average 1.52% gross margin. *Id*.

### A. Trans Coastal's Operations In California.

36. In addition to Trans Coastal, Pam Moses, Trans Coastal's President, and Robert Briscoe, Trans Coastal's Director, each also owned fifty percent of a California corporation formed in 2008 or 2009 called Brea Commodities. *See* Ex. 24 (4/7/2016 P. Moses 30(b)(6) Dep. Tr. 88:9-18).

37. Brea Commodities was "a marketing office in which they were a customer of Trans Coastal, basically," and its "primary responsibility was to either service existing [Trans Coastal] customers or -- or find new customers." *See id*. at 88:19-24, 96:2-6.

38. "[A]bout a year after [Brea] was established," Brea Commodities "was absorbed into Trans Coastal," and the Brea employees became Trans Coastal employees. *Id*. at 92:24-93:8.

39. Ms. Moses testified as a corporate representative that she believed Brea Commodities was absorbed into Trans Coastal in 2009 or 2010. *See id*.

40. Once Brea Commodities was absorbed by Trans Coastal, the office remained in Brea, California. *See* Ex. 31 (6/2/2016 P. Yang Dep. Tr. 35:6-36-8).

41. The Brea office would meet with Chinese and Korean customers in the Los Angeles area rather than those customers coming to Illinois because Trans Coastal's Brea-based employees spoke Korean and Chinese and Ms. Moses did not speak those languages. *See* Ex. 24 (4/7/2016

P. Moses 30(b)(6) Dep. Tr. 95:7-19) (The Brea employees "would meet with customers . . . that were in the LA area or that would come over from overseas, that wouldn't come to Chicago. They spoke Korean and Chinese, and a lot of -- there were many of our customers that spoke Korean and Chinese, and I did not have the ability. So they could -- they could be the voice.").

42. Ms. Yang testified that Brea employee Sol Kim, senior trader in the Brea office, was responsible for dealing with and "screening Chinese buyers" and Ms. Moses did not "make the decision about who to trade with." Ex. 31 (6/2/2016 P. Yang Dep. Tr. 95:12-17).

43. Multiple of Trans Coastal's corn and DDGS shipments to China were exported out of California. *See, e.g.*, Ex. 32 (TCSC00000408); Ex. 33 (TCSC00000849); Ex. 34 (TCSC00000878); Ex. 35 (TCSC00000947).

44. Minglu Li, who worked first in reviewing sales documents and later making sales herself in Trans Coastal's Brea office between 2012 and 2014, testified that she communicated by email with person at Syngenta who provided biosafety certificates, but she never had a "verbal conversation" and that she did not "know the person there. [She] only contacted the person [who] sent the certificate, but [she] never me[t] them in person." *See* Ex. 36 (6/3/2016 M. Li Dep. Tr. 235:2-23).

45. Ms. Moses testified in a 30(b)(6) deposition that the Brea office had responsibility for requesting biosafety certificates from Syngenta because "a lot of those things in the requests, you know, that was designated for our California office to take care of." *See* Ex. 37 (10/25/2016 P. Moses 30(b)(6) Dep. Tr. 1355:18-25); *see also id.* at 1354:19-25 (noting that Ms. Moses was "answering questions in [her] capacity as a representative of the company").

46. Ms. Moses also testified that conversations regarding biosafety certificates "went back and forth, from I believe, the California office employees and Syngenta." *See* Ex. 38 (5/27/2016

P. Moses 30(b)(6) Dep. Tr. 1150:3-14); *see also id*. at 920:13-14 (identifying "Deposition of Pamela Moses 30(b)(6) Representative of Trans Coastal Supply").

47.     Ms. Moses testified as a corporate representative that the individuals in the Brea office were "more or less" in daily or near daily communications with customers in China about events in China that impacted their business. *See* Ex. 39 (4/8/2016 P. Moses 30(b)(6) Dep. Tr. 394:16-22); *see also id*. at 487:14-16 (testifying that Ms. Moses was "here as a Trans Coastal representative").

**B.      Trans Coastal's Line Of Credit And Bankruptcy.**

48.     Trans Coastal entered into a Financing Agreement and Revolving Loan Note with U.S. Bank on April 30, 2013, for $35 million. *See* Ex. 40 (P. Moses Dep. Ex. 142). The amount of the revolving loan was later increased to $40 million and then to $50 million.

49.     On December 31, 2013, Ms. Moses stated in an email to U.S. Bank that Trans Coastal had an overdraft because U.S. Bank's "Global Trade has been behind in processing our documents timely for a number of weeks. . . . For every set of documents missed, collections of those funds are delayed a day. This is sometimes millions of dollars. Today, that is a major issue with our balances. In addition, it appears that postings of collections to the system are also delayed and occurring after 4pm daily which is pushing them to the next business day. Again, another day of delay for funds - this is a major issue that needs addressed [sic] and is impacting us in a negative fashion." Ex. 41 (TCSC01101539).

50.     In a February 6, 2014 email from Ms. Moses to U.S. Bank requesting an increase of the $40 million line of credit, Ms. Moses stated "Today, our current level of $40 [million] is well under our needs with the growth taken on with the new facilities as well as growth at previous facilities in our network. Other factors that have changed with the growth this last quarter was an overall slowdown in both documentation and collections. While staff was added at both Trans

Coastal and the Freight Forwarders, we remain at about 1 to 2 weeks behind in documentation to the banks.  This, combined with issues in Global Trade to both handle and collect funds, has pushed our days to pay from 17 to 35 in the last few months."  Ex. 42 (P. Moses Dep. Ex. 144).

51.      On August 1, 2014, U.S. Bank notified Trans Coastal that it was in default of its line of credit.  *See* Ex. 43 (Exhibit E to Complaint, *U.S. Bank National Association v. Pamela D. Moses and Robert J. Briscoe*, Case No. 4:16-cv-00730-CEJ (Dkt. 1-6)).

52.      On July 23, 2015, Trans Coastal filed for Chapter 11 bankruptcy.  Ex. 44 (*In re: Trans Coastal Supply Co., Inc.,* Chapter 11, Case No. 15-71147, July 23, 2015 Voluntary Petition (Dkt. 1)).

53.      Trans Coastal emerged from bankruptcy in January 2018.  Ex. 45 (*In re:  Trans Coastal Supply Co., Inc.*, Chapter 11, Case No. 15-71147, January 24, 2018 Final Decree (Dkt. 641)).

## IV.      TRANS COASTAL'S SALES OF U.S. CORN AND DDGS TO CHINA AND CHINA AS A MARKET FOR TRANS COASTAL'S SALE OF U.S. CORN AND DDGS

54.      Trans Coastal employee Pauline Yang testified that in 2007, "China was closed" for DDGS; "there was no market for DDGS in China."  *See* Ex. 31 (6/2/2016 P. Yang Dep. Tr. 33:16-34:15).

55.      Ms. Moses likewise testified that Trans Coastal was not shipping corn or DDGS to China in 2007.  Ex. 24 (4/7/2016 P. Moses 30(b)(6) Dep. Tr. 142:5-24).

56.      Eric Woodie, a DDGS trader at Trans Coastal, further testified that "there was a case brought where the Chinese DDG industry brought an anti-dumping case against the U.S. market and it ended up being stopped or kicked out some months after it started."  Ex. 46 (6/7/2016 E. Woodie Dep. Tr. 77:16-20).  Asked whether there was "any impact on the DDG market from the bringing of the anti-dumping case," Mr. Woodie responded, "Yeah, certainly. . . . With a lot

less volumes going there, it would impact the DDG market. You know, in 2011, things pulled back pretty good. So that's going to have an impact on the market." *Id*. at 77:23-78:8.

57.     Ms. Moses testified that there was an anti-dumping lawsuit or investigation in China before 2012. As a result, Trans Coastal "shipped less to China because less buyers would purchase." Ex. 39 (4/8/2016 P. Moses 30(b)(6) Dep. Tr. 393:5-394:3). Trans Coastal learned of the anti-dumping investigation from its customers. *See id*. at 394:4-6.

58.     According to a spreadsheet Trans Coastal "put together on its volumes into China," *id*. at 594:5-595:3, 2010 was Trans Coastal's "[f]irst year trading with China," with 13,751 metric tons of DDGS to China. *See* Ex. 47 (TCSC03227178).

59.     The same spreadsheet shows that in 2011, "[t]he year of the anti dumping charges against DDGS traders," Trans Coastal exported 6,617 metric tons of DDGS to China. *See id*.

60.     In 2010, 41 percent of Trans Coastal's containers loaded to China contained DDGS. "And then in 2011, . . . 21 percent of all contained loaded . . . were DDGS to China." Ex. 39 (4/8/2016 P. Moses 30(b)(6) Dep. Tr. 608:6-21). "[T]he percentage of [Trans Coastal's] total DDGS exports . . . that went to China dropped by 20 percent in 2011[.]" *Id*. at 600:15-20.

61.     In 2012, "anti dumping [was] dropped mid year," and Trans Coastal exported 10,143 metric tons of DDGS to China. Ex. 47 (TCSC0322178).

62.     In 2013, Trans Coastal exported 19,520 metric tons of DDGS to China. *See id*.

63.     Mr. Woodie testified that, in 2013, China was "starting to receive a lot of DDGs in some pretty high volumes. So the government started to get interested as to why and be protective of their own corn, their own DDG, with some intent on being less reliant on the foreign country, certainly the U.S." Ex. 46 (6/7/2016 E. Woodie Dep. Tr. 234:14-22).

64.     At the time of his deposition in 2016, Mr. Woodie testified that there was "a current anti-dumping suit," which meant "there's less being exported there now." *Id*. at 109:12-111:5.

65.     Asked whether he did "anything to assess what the impact of the Chinese anti-dumping investigations with regard to DDGS would have been in the but-for world in which Trans Coastal would have continued shipping DDGS to China as expected in the 2014 and 2015 period," Dr. Woods testified: "Not specifically[.]" Ex. 48 (12/20/2016 J. Woods Dep. Tr. 257:15-22).

## V.     TRANS COASTAL'S AWARENESS THAT IT WAS SHIPPING U.S. CORN AND DDGS TO CHINA WITH UNAPPROVED GM EVENTS

### A.     Trans Coastal's Knowledge That MIR162 Was Not Approved For Import To China And China's Rejections Citing MIR162 In 2013.

66.     Ms. Moses gave the following testimony as a corporate representative for Trans Coastal regarding topics including Trans Coastal's "awareness of whether or not China had approved MIR162, including when and how [it] first became aware that China had approved MIR162": "Did you believe that MIR162 was approved for import into China in 2013? A. No." "Did you believe it was . . . approved for import into China for all periods before December 2014? A. No." Ex. 49 (P. Moses Dep. Ex. 1 at 9, Topic No. 49); Ex. 39 (4/8/2016 P. Moses 30(b)(6) Dep. Tr. 589:11-591:1).

67.     Mr. Briscoe testified that he was aware of China's zero tolerance policy in 2013. *See* Ex. 50 (5/17/2016 R. Briscoe Dep. Tr. 111:22-112:10).

68.     Trans Coastal was aware that China began rejecting shipments of U.S. corn citing the presence of MIR162 in November 2013. *See, e.g.*, Ex. 51 (TCSC00152081); Ex. 52 (TCSC00159707); Ex. 53 (P. Yang Dep. Ex. 82) (TCSC01436969); Ex. 54 (P. Moses Dep. Ex. 11 (TCSC01441283)).

69.     On December 6, 2013, Mr. Kim, who was responsible for drafting weekly reports at Trans Coastal, wrote: "Corn vessels and containerized corn are being held/rejected by China

CIQ for MIR162.  We have a lot of containerized corn headed to china.  a little bit of bad luck and we could be in a sticky situation too. . . . Anyway, I know it costs more, but we may have to do some more testings to make sure we're steering clear from the MIR162 cause china is being strict about it."  Ex. 55 (P. Moses Dep. Ex. 19) (TCSC01436970); *see also* Ex. 39 (4/8/2016 P. Moses 30(b)(6) Dep. Tr. 433:14-435:4).

70.     On December 26, 2013, Mr. Kim wrote: "I got over 20 e-mails and as many texts and calls in the past 18 hours regarding this MIR162 issue . . . . We'll have to . . . remind [customers] that this is all importers risk and buyers responsibility."  *See* Ex. 39 (4/8/2016 P. Moses 4/8/2016 Dep. Tr. 413:19-414:17).

71.     Ms. Moses testified that, at least as of December 26, 2013, "it was not possible for Trans Coastal to ensure that [its DDGS shipments] were free" of MIR162. *See id*. at 417:10-418:12.

72.     In a December 27, 2013 "Business Letter," Trans Coastal customer Twins Group Co., Ltd. wrote to Trans Coastal reminding it that MIR162 had not been approved for import in China.  *See* Ex. 56 (P. Moses Dep. Ex. 14 (TCSC03228697)) ("Hereby we inform you that, the corn and DDGS with GMO MIR162 hasn't been approved by the People's Republic of China, and it's stipulated by the General Administration of Quality Supervision, Inspection and Quarantine of the People's Republic of China.  Here we inform you to suspend all the shipment of DDGS which you can't guarantee without MIR162, otherwise, all the risks, costs and expenses will be for your account.  Here we request you to do the test before shipment and we will not accept any products with GMO MIR162, and request you to do the advanced arrangement for all the shipments on the way to avoiding the unnecessary costs and troubles, we will not take any responsibility for this.").

### B. Trans Coastal's Risk Term In Contracts For The Sale Of U.S. DDGS To China.

73. On December 25, 2013, in response to an email from Minglu Li stating "it has been confirmed that Qingdao is starting to checking the ddgs for every shipment now," Mr. Woodie wrote: "we need to remember this is buyers responsibility. They have purchased DDGS; none have a clause stating no MIR162." Ex. 57 (P. Moses Dep. Ex. 15 (TCSC01428261)).

74. Some of Trans Coastal's contracts for the sale of U.S. DDGS to China contained the term "MIR162 and non-registered risk for buyer." *See* Ex. 58 (E. Woodie Dep. Ex. 107).

75. Another Trans Coastal sales contract with customer Zhejiang contained the following term: "The DDGS purchased and shipped on this contract have the risk of containing unapproved GMO trait MIR 162. Risk of rejection and any cost associated with this will be for buyer account." Ex. 59 (P. Moses Dep. Ex. 58); *see also* Ex. 38 (5/27/2016 P. Moses 30(b)(6) Dep. Tr. 1064:9-15).

76. Mr. Woodie testified that this term "means essentially that any risk associated with the nonapproval of MIR162 was for the buyers, not for the seller. . . . So if, for some reason, because of MIR162 not being approved, that the buyer couldn't get it imported then those risks and those costs associated would be for the buyer. . . . So if it sits at the port, if they have to resell it to someone else and it's at a different pricing, those costs would fall to the buyer." Ex. 46 (6/7/2016 E. Woodie Dep. Tr. 142:13-143:12); *see also* Ex. 58 (E. Woodie Dep. Ex. 107).

77. Ms. Moses testified that Trans Coastal included the term that the importer bore the risk of MIR162 rejection "to reduce [its] risk" and "because [it] didn't want to be hit with losses." Ex. 39 (4/8/2016 P. Moses 30(b)(6) Dep. Tr. 496:7-15); *see also* Ex. 60 (5/26/2016 P. Moses 30(b)(6) Dep. Tr. 842:9-843:25, 853:23-854:3); *see also id.* at 635:13-14 (identifying "Deposition of Pamela Moses 30(b)(6) Representative of Trans Coastal Supply").

78.     In a January 21, 2014 email responding to a customer seeking costs from Trans Coastal, Ms. Moses wrote: "That is not what we contracted nor what we will agree to.  We will divert cargo and send any charges to them.  In addition, they will be on a no trade list until the payment for diversions and demurrage is paid.  It's unfortunate but true.  We tested at origin, and did not accept risk with CIQ on the contract.  They knew what they bought."  Ex. 61 (TCSC00023736).

79.     In a May 7, 2014 email regarding a corn rejection, Ms. Moses wrote:  "Everyone knew the risks when we shipped it.  Even if negative at origin which wasn't guaranteed, it still had risk at destination."  Ex. 62 (TCSC00484122).

**C.      Trans Coastal's Knowledge That MIR162 Was Still Not Approved In China In 2014.**

80.     In an April 4, 2014 e-mail among Mr. Kim, Ms. Moses, and others regarding "sales and marketing reports," Mr. Kim wrote: "MIR162 did not get approved by the China biosafety committee this week. . . . This news is not boding well for our Shanghai corn either. What's contributing to this?  Hard to say.  Chinese president seems to not want to try and rely on the US for food security. They want to be more independent and they have an opportunity to do that this year. . . . Around 40% of shipments are getting caught. . . . Current ddgs situation in Qingdao is that there is around 100,000-150,000MTS sitting in storage.  Around 90,000MTS DDGS in storage because of MIR 162.  The remaining is available for sale but local price is still low so the ddgs is not moving out quickly."  Ex. 63 (P. Moses Dep. Ex. 17).

81.     In a June 10, 2014 email, after a meeting with CIQ officials, Mr. Kim wrote: "although they are not certain, they strongly believe that there will be no approval for MIR162 in June.  They know it is a politically charged decision.  As to when they might approve it, they said

November….” Ex. 64 (E. Woodie Dep. Ex. 114); *see also* Ex. 31 (6/2/2016 P. Yang Dep. Tr. 201:2-6).

## VI. TRANS COASTAL'S SHIPMENTS OF U.S. CORN AND DDGS IN LATE 2013 AND THROUGH 2014

### A. Purported Misrepresentations.

82. Ms. Moses testified as the corporate representative for Trans Coastal on, among other topics, “Alleged Misrepresentations,” including “70. Each alleged false or misleading description or representation of fact that you [Trans Coastal] contend Defendants made regarding MIR162, the timing of its approval by China . . . 71. Your review or reliance on each statement identified in response to Matter for Examination for No. 70, including when and how you first became aware of each statement as well as any losses or other harm allegedly caused by each such statement.” *See* Ex. 49 (P. Moses Dep. Ex. 1); *see also* Ex. 24 (4/7/2016 P. Moses 30(b)(6) Dep. Tr. 11:16-20) (testifying that Ms. Moses understood that she was “testifying as a designated representative of Trans Coastal Supply Company, Inc.”).

83. Ms. Moses testified as a corporate representative that she did not know if Trans Coastal ever received the letter from Charles Lee of Syngenta dated August 17, 2011. Asked “whether or not you read the letter,” Ms. Moses testified: “I can't tell you that I did, but I can't tell you that I didn't.” Ex. 38 (5/27/2016 P. Moses 30(b)(6) Dep. Tr. 1076:4-1078:20).

84. With regard to Syngenta's 2012 earnings conference call identified in Trans Coastal's complaint, Ms. Moses testified that she did not “listen to that conference call” or “read a transcript of that conference call,” and that she was “not aware of any Trans Coastal employee ever listening in on that conference call” or “reading a transcript of that conference call.” Ex. 39 (4/8/2016 P. Moses 30(b)(6) Dep. Tr. 560:18-561:19).

85.	Ms. Moses could not identify any statements made by Syngenta on any U.S. Grains Council conference calls referenced in Trans Coastal's complaint or any steps Trans Coastal took in reliance on statements made during any of those calls.  *See id*. at 564:14-568:11.

86.	Asked whether she believed "MIR162 was approved" when she sent a biosafety certificate request form to Syngenta, Trans Coastal's Minglu Li testified: "I don't know."  Ex. 36 (6/3/2016 M. Li Dep. Tr. 226:16-18).

87.	Syngenta's Plant With Confidence Fact Sheet was distributed in or about March 2014.  *See* Ex. 65 (SYNG_00692090).

88.	Trans Coastal has not provided evidence that it read or relied on the Plant With Confidence Fact Sheet identified in its complaint.

89.	During her 30(b)(6) deposition on Topics 70 and 71, *see supra* SOF ¶ 82, when asked "Can you point me, sitting here today, to any news story you read at any point in time where you read that Syngenta said MIR162 was going to be approved," Ms. Moses could not identify any such article or story without internet access during the deposition.  Ex. 39 (4/8/2016 P. Moses 30(b)(6) Dep. Tr. 551:7-552:15).

90.	Asked to identify "every statement [Trans Coastal] heard or read about the approval of MIR 162" that it claimed to have relied on, Ms. Moses testified "That's an impossibility."  Ex. 38 (5/27/2016 P. Moses 30(b)(6) Dep. Tr. 1095:8-13).

91.	Instead, Ms. Moses testified that "[s]o long as a representation was made to the marketplace, that representation was made to [Trans Coastal]."  *Id*. at 1086:8-11.

92.	At her 30(b)(6) deposition, Ms. Moses was asked:  "Did you rely on any statements by Syngenta in making decisions to enter into contracts to sell corn and DDGS to China in 2013 and 2014."  Ms. Moses could not testify that she relied on any such statements and instead testified

that "I can't tell you that I did or didn't."  Ex. 39 (4/8/2016 P. Moses 30(b)(6) Dep. Tr. 572:10-15).

93.     Mr. Woodie also testified that he did not "ever rely on any representations by Syngenta about when MIR162 would be approved" in making trading decisions about DDGS. Ex. 46 (6/7/2016 E. Woodie Dep. Tr. 247:2-8).

**B.      Trans Coastal's Late 2013 And Through 2014 Contracts And Shipments Of U.S. Corn And DDGS To China.**

94.     After rejections of U.S. vessels began and after Trans Coastal was aware that vessels were being rejected, *see supra* SOF ¶¶ 68-72, Trans Coastal continued to enter into contracts to sell DDGS to China and to ship DDGS to China in late 2013 and continued in 2014. *See* Ex. 39 (4/8/2016 P. Moses 30(b)(6) Dep. Tr. 418:13-420:14) ("Q: You went ahead and actually shipped a whole bunch more DDGS to China in 2014; correct? . . . . A: I don't know what a whole bunch more is, but we shipped some, yes, after receiving this letter."); *see also* Ex. 60 (5/26/2016 P. Moses 30(b)(6) Dep. Tr. 842:9-843:25, 853:23-854:3) ("Q: On this particular contract which you entered into on March 24th, 2014, you understood that MIR 162 was not approved at that time for import into China, correct A: You know, it was not approved at that time. Q: Okay. And you still entered into this contract on March 24th, right? A: Yes, we did.").

95.     Ms. Moses testified that "notwithstanding the fact that officials of the Chinese CIQ had informed [Trans Coastal] that there might not be approval until November of MIR162 imports," Trans Coastal entered into contracts in 2014 because "[t]he customers were wanting to buy it, I suppose.  Or we wouldn't have sold it."  Ex. 39 (4/8/2016 P. Moses 30(b)(6) Dep. Tr. 533:25-535:2).

96.     Mr. Briscoe, Trans Coastal's co-owner and director, testified that when he found out "in late November or late 2013 that there were issues with China's acceptance of U.S. corn,"

he did not "tell [his] staff in January of 2014 to stop selling to China."  Ex. 50 (5/17/2016 R. Briscoe Dep. Tr. 135:21-136:18)

97.     According to its contract log, Trans Coastal entered into over 200 contracts for the sale of DDGS between January 2, 2014 and October 14, 2014.  *See* Ex. 66 (P. Moses Dep. Ex. 5, TCSC00000120) (Trans Coastal's contract log); *see also* Ex. 24 (4/7/2016 P. Moses 30(b)(6) Dep. Tr. 179:22-183:5) (explaining contract log).

98.     According to Ms. Yang, around January 2014, the Brea employees met with Ms. Moses and Mr. Briscoe at Trans Coastal's Brea office, where they discussed whether they should continue selling DDGS to China.  Ms. Yang testified that Trans Coastal "didn't think it was going to be that serious after the fact happened . . . . because it's China. . . . you know, it's the culture thing, they, you know, do that [sic] Americans won't do.  So, you know, if they say they can do it, you know, what can we do on our end, you know, other than believe them?"  *See* Ex. 31 (6/2/2016 P. Yang Dep. Tr. 153:24-154:24).

99.     Mr. Woodie testified that "at different ports there would be varying degrees of strictness in terms of which DDGS could actually get imported into China."  Ex. 46 (6/7/2016 E. Woodie Dep. Tr. 209:13-20).

100.    Ms. Moses testified that "as long as the customers assume [the] responsibility [to get DDGS through customs], [she was] comfortable shipping DDGS to China in 2014."  Ex. 39 (4/8/2016 P. Moses 30(b)(6) Dep. Tr. 432:25-433:11).

## VII.    TRANS COASTAL'S PURPORTED DAMAGES

101.    Trans Coastal's proffered damages expert, Dr. Woods, opines that Trans Coastal's total damages are "the difference between expected profits and actual profits.  Between January 2014 and August 2016, Trans Coastal would have earned profits of $20.6 million.  During the

same time period it lost $40.7 million.  Total damages are $66.5 million."  Ex. 23 (10/17/2016 J. Woods Rpt. at 28).

102.    Dr. Woods stated in his report that "[t]he profits Trans Coastal would have earned are based on its 2014 forecast.  In December 2013, Trans Coastal prepared a forecast for 2014 that does not include the negative impact of MIR162 on exports to China."  That forecast "indicates that Trans Coastal would have exported between 5,900 and 6,200 containers of commodities per month."  *Id*. at 22.

103.    Dr. Woods's damages number includes "losses related to U.S. purchases" and "losses related to washed out Chinese contracts."  Ex. 23 (10/17/2016 J. Woods Rpt. at 18-20).

104.    Dr. Woods testified that he relied on a "December 2 forecast" for his "projections for 2014, 2015, and 2016."  Ex. 48 (12/20/2016 J. Woods Dep. Tr. 221:13-18).

105.    Asked whether he knew "what documents [Trans Coastal's Mr. Stanko] looked at" in making the December 2 forecast, Dr. Woods testified: "Not specifically, no."  *Id*. at 65:3-5.

106.    Asked whether he "assess[ed] how any previous projections Mr. Stanko prepared in connection with Trans Coastal's business for years other than 2014 compared with actual results," Dr. Woods answered: "Not specifically, no."  *Id*. at 68:21-25.

107.    Dr. Woods further stated that he "estimate[d] that Trans Coastal would be able to export this same volume in 2015 and 2016."  Ex. 23 (10/17/2016 J. Woods Rpt. at 22).

108.    Dr. Woods wrote in his report that "Trans Coastal incurred additional costs to export products to its customers including costs for demurrage, detention, diversion, rejection, portage, drayage, disposal, abandonment, storage, redirection and deferral," and that "Trans Coastal incurred additional costs on shipments that were delayed, detained, or re-routed and lost profits on lost opportunities which total $48.2 million."  *Id*. at 20-21, 29.

109.     Dr. Woods testified that "the result of the overall methodology" he used "would attribute any and all losses on soybean meal sales to MIR162 as long as it occurred after December 2013." Ex. 48 (12/20/2016 J. Woods Dep. Tr. 217:16-20).

110.     Dr. Woods also testified he did not do anything "specifically" to "assess what the impact of the Chinese anti-dumping investigations with regard to DDGS would have been in the but-for world in which Trans Coastal would have continued shipping DDGS to China as expected in the 2014 and 2015 period." *Id*. at 257:15-22.

111.     Dr. Woods further testified that he did not "do anything to assess the impact of the ethanol plant registration requirement on Trans Coastal's export of DDGS to China." *Id*. at 253:2-6.

112.     Dr. Woods testified that he did not "undertake to determine whether any of the purchases [from washed out Chinese contracts] were earmarked for shipments destined to China." *Id*. at 130:25-131:4.

113.     Dr. Woods also testified that "[i]t's possible that some of [those] invoices were related to products other than DDGS," and "it's possible that some of those invoices were related to shipments that were not China bound." *Id*. at 206:2-9.

114.     Dr. Woods further testified that "[h]ad the buyers performed on the contracts that were the subject of the washouts," for which he included a "$5.5 million damage item," Trans Coastal's profits on those contracts would have been "[a]pproximately $460,000." *Id*. at 151:5-15.

115.     On April 11, 2014, in a sales and marketing report, Mr. Kim wrote: "China has now defaulted around 500,000MTS soybeans from the US and Brazil . . . some of the major chinese

soybean importers can't open LCs. Default is the only choice for them….or so they say. Seems like more of an excuse and simple economics." Ex. 67 (R. Briscoe Dep. Ex. 39).

116.    On December 2, 2013, Ms. Moses wrote in an email to colleagues: "At this point - we are way behind on shipments - late fees on 1 week for CGM is $12/ton or $300+ per container, and combine 2 weeks of $85/day in per diem, we are under the water on these by another $850. Trading is easy, getting the execution and details correct is where we make or lose money." Ex. 68 (TCSC01111946).

117.    Trans Coastal has not identified any quantum of damages attributable to Syngenta's commercialization of Duracade. The terms "Duracade" and "Event 5307" do not appear in Dr. Woods's report. *See generally* Ex. 23 (10/17/2016 J. Woods Rpt.).

## VIII. BRIBERY AND "UNDER THE TABLE" PAYMENTS IN TRANS COASTAL'S SALES TO CHINA

118.    In a December 22, 2012 email to Ms. Moses and others, Sol Kim wrote about exporting unregistered DDGS to China and stated: "A little bit of bribery could probably easily get the product through." Ex. 69 (TCSC01253176).

119.    In a March 25, 2014 email to Ms. Moses about the sale of U.S. corn to China, Mr. Kim summarized conversations with a customer, "PROS: They can take in shanghai. No need to transfer. Price is $245/net to us. Much higher than rich grains. Price may go up to $255, in which case they will take the commission and work something under the table if they deem that is necessary." Ex. 70 (TCSC00028679).

120.    In the same email chain on April 4, 2014, Mr. Kim wrote regarding a sale of U.S. corn that "If the goods pass GMO inspection and the quality is same or better than the quality on the contract, the feed mill will pay us around $340/mt. Our net price as discussed previously will

be $245/mt.  Contract price will likely be written as $340/mt though.  Leaving $95/mt to cover all sorts of fees such as . . . under the table fees, etc etc." *Id.*

121.    On August 8, 2014, Ms. Moses was sent an email regarding Trans Coastal corn clearing customs that said "someone who got relationships with [CIQ] told me that the officer would like to have money ($24154) to guarantee all our containers can be pulled to warehouse directly (do not wait for the inspection results for MIR162), and it may have good impacts for the inspection results for 4700T corn."  Ms. Moses responded: "If it gets all of it clear to mir 162, pay it."  Ex. 71 (P. Moses Dep. Ex. 22 (TCSC00962493)).

122.    Asked whether Ms. Moses was "authorizing the payment of a bribe to a foreign official for inducing that official to violate his lawful duties in order to secure a business advantage," Ms. Moses was instructed by counsel not to answer "in part" based on the Fifth Amendment and Ms. Moses accepted that instruction.  *See* Ex. 39 (4/8/2016 P. Moses 30(b)(6) Dep. Tr. 451:6-452:9, 481:20-484:2).

123.    In reference to an email from Mr. Kim, asked whether it would "be surprising that a government official is being paid off in China," Mr. Woodie responded "Oh, God, no."  Ex. 46 (6/7/2016 E. Woodie Dep. Tr. 214:19-215:13).

## STATEMENT OF QUESTIONS PRESENTED

1.    The Court previously dismissed all of the Lanham Act claims filed by producer and non-producer plaintiffs in the overall Viptera litigation on theories identical to those Trans Coastal asserts here.  Should the Court grant summary judgment dismissing Trans Coastal's Lanham Act claim?

2.    Trans Coastal seeks to hold Syngenta responsible for purely economic losses, including for alleged lost profits unrelated to the sale of corn or DDGS to China, as well as for the

value of contract claims asserted against it by its suppliers. Does the economic loss doctrine bar Trans Coastal's claims, particularly given the remoteness of its alleged damages?

3.     Should Trans Coastal's claims be dismissed for lack of causation when the unrefuted record shows that Trans Coastal knew MIR162 was in the U.S. corn supply, recognized the risk of shipping to China because MIR162 was not yet approved in China, and then continued to enter into contracts for the sale of DDGS to China for several months *after* the rejections began and with full knowledge that its shipments could be rejected?

4.     Can Trans Coastal succeed on its claim of negligent interference with prospective economic advantage when it cannot prove any of the elements of that cause of action?

5.     Can Trans Coastal's fraudulent misrepresentation claim survive summary judgment when it has not identified (i) a single misrepresentation that Syngenta made to it; (ii) a single action that it took in actual reliance on any purported misrepresentation; or (iii) any basis for demonstrating justifiable reliance given that it sold and shipped DDGS to China knowing that China had not yet approved MIR162?

6.     Should Trans Coastal's lost-profits claim be dismissed as impermissibly speculative when Trans Coastal has no consistent track record of shipping corn or DDGS to China and its damages expert's lost-profits calculations are based on an unproven and unreliable projection created for different purposes?

7.     Should Trans Coastal's remaining damages claims be dismissed as arbitrary and unsupported by the evidence when Trans Coastal seeks damages unrelated to corn and DDGS, seeks damages for shipments to countries other than China, and otherwise fails to distinguish between losses purportedly attributable to MIR162 as opposed to other causes?

## LEGAL STANDARD

"Summary judgment is appropriate when there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." *Hardscrabble Ranch, L.L.C. v. United States*, 840 F.3d 1216, 1219 (10th Cir. 2016) (citing Fed. R. Civ. P. 56(a)). "While [Syngenta, as the movant,] bears the burden of showing the absence of a genuine issue of material fact, [Syngenta] need not negate [Trans Coastal's] claim, but need only point to an absence of evidence to support [Trans Coastal's] claim." *Kaul v. Stephan*, 83 F.3d 1208, 1212 (10th Cir. 1996) (citation omitted). In other words, "[t]o be entitled to summary judgment, [Syngenta] is not required to disprove plaintiff's claims." *Martinez v. CO2 Servs., Inc.*, 12 F. App'x 689, 694 (10th Cir. 2001). Once Syngenta carries its "initial burden" of pointing to an absence of evidence, Trans Coastal "may not rest upon its pleadings, but must set forth specific facts showing a genuine issue for trial as to those dispositive matters for which it carries the burden of proof." *Kaul*, 83 F.3d at 1212 (citation omitted). A fact is "material" if it "might affect the outcome of the suit under the governing law," and a "genuine" issue exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). As a result, "[u]nsupported conclusory allegations," a "conclusory affidavit from an expert witness," and "mere speculation" do not establish genuine issues of material fact. *Martinez*, 12 F. App'x at 694-95 (alteration in original) (collecting cases). Likewise, evidence that is "merely colorable, or is not significantly probative" cannot defeat summary judgment. *Anderson*, 477 U.S. at 249-50 (citation omitted).

In addition, "the content of the evidence that the nonmoving party points to must be *admissible*." *Adams v. Am. Guar. & Liab. Ins. Co.*, 233 F.3d 1242, 1246 (10th Cir. 2000). And although "the summary judgment standard requires [courts] to view the facts in the light most favorable to the non-moving party[,] it does not require [courts] to make unreasonable inferences

in favor of the non-moving party." *Carney v. City & Cty. of Denver*, 534 F.3d 1269, 1276 (10th Cir. 2008) (second alteration in original) (citation omitted).

As this Court has underscored, "summary judgment is *not* a 'disfavored procedural shortcut;' rather, it is an important procedure 'designed to secure the just, speedy and inexpensive determination of every action'" as required by Rule 1. *Nat'l Credit Union Admin. Bd. v. UBS Sec., LLC*, Nos. 12-2591-JWL & 12-2648-JWL, 2016 WL 7373857, at *2 (D. Kan. Dec. 20, 2016) (Lungstrum, J.) (emphasis added) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986)). Thus, "[t]he denial of a meritorious motion for summary judgment is no less error than the grant of an unworthy one." *Bruner v. Baker*, 506 F.3d 1021, 1025 n.5 (10th Cir. 2007).

## ARGUMENT

### I.    TRANS COASTAL'S LANHAM ACT CLAIM FAILS AS A MATTER OF LAW.

Trans Coastal's Lanham Act claim fails for the reasons this Court has recognized in dismissing all other Lanham Act claims brought by producer and non-producer plaintiffs throughout the overall Viptera litigation.[1]  Trans Coastal bases its Lanham Act claim on (1) the biosafety certificate request form; (2) the "Plant With Confidence" Fact Sheet; and (3) a 2011 Syngenta letter sent by Chuck Lee.  ECF No. 2530, NPP TAC ¶¶ 350-55; *see* ECF No. 927, at 114-25.[2]  The Court previously granted summary judgment against the Nationwide Lanham Act class, and motions to dismiss in the Louis Dreyfus and DeLong exporter cases, based on the same challenged representations.  Agribase (represented by the same counsel that represents Trans

---

[1]    In advance of this motion, Syngenta asked Trans Coastal's counsel whether it intended to pursue the Lanham Act claim in light of the Court's prior rulings, but received no response.  *See* Ex. 72 (10/30/2019 email from M. Onufer).

[2]    Trans Coastal originally asserted a Lanham Act claim based on Syngenta's deregulation petition and statements made in Syngenta's earnings calls, but the Court dismissed those additional bases at the pleading stage.  *In re Syngenta AG MIR 162 Corn Litig.*, 131 F. Supp. 3d 1177, 1224-27 (D. Kan. 2015) (Lungstrum, J.) ("MDL MTD Order").

Coastal here) voluntarily dismissed its Lanham Act claim.  Trans Coastal cannot demonstrate any basis for deviating from the Court's previous Lanham Act rulings.[3]

## A.  Biosafety Certificate Request Form.

The Court has consistently rejected Lanham Act claims based on Syngenta's biosafety certificate request form.  Most recently, the Court's order dismissing DeLong's Lanham Act claim found that the alleged misrepresentations identified in the biosafety certificate request form were not made "in commercial advertising or promotion" and therefore could not form the basis of this cause of action.  *The DeLong Co., Inc. v. Syngenta AG*, No. 17-2614-JWL, Dkt. 23 Mem. and Order ("DeLong MTD Order"), at 4 (citing MDL MTD Order).  There is no reason to depart from these rulings here.

## B.  Plant With Confidence Fact Sheet.

The Court has also determined that Syngenta's March 2014 (*see* SOF ¶ 87) "Plant With Confidence" Fact Sheet cannot support a Lanham Act claim because, even under Trans Coastal's theory, "any contamination would already have been inevitable under the plaintiff's theory because of the prior sales and planting of the seed in the 2010-11 season."  DeLong MTD Order at 4 (citing LDC MTD Order, 2018 WL 489098, at *2-3).  That ruling should also apply here.[4]

---

[3]  *See generally* Sched. Order No. 1 ¶ 5(h), ECF No. 123 ("The court does not intend to revisit issues that have already been decided just because a newly added party disagrees with the court's reasoning or result."); DeLong MTD Order at 4, n.1 ("[T]he Court has previously indicated that it will rule in a consistent fashion on issues that it has already addressed in this MDL unless good cause is shown to depart from a prior ruling.").

[4]  Indeed, the Kansas producer plaintiffs withdrew the Plant With Confidence Fact Sheet as a basis for Lanham Act liability in opposing Syngenta's summary judgment motion.  And in its Amended Complaint, LDC similarly withdrew the Fact Sheet as a basis for its Lanham Act claim.  In addition, Trans Coastal cannot demonstrate that the Fact Sheet contained any false or misleading statements of fact likely to cause confusion about Viptera.  *See Gen. Steel Domestic Sales, LLC v. Chumley*, 627 F. App'x 682, 683-84 (10th Cir. 2015).  The statement in the Fact Sheet that "most" grain outlets "have no reason to restrict your right to plant the latest technologies" is plainly an expression of Syngenta's opinion about what grain outlets should do and therefore is not actionable.  *See, e.g., Intermountain Stroke Ctr., Inc. v. Intermountain Health Care*, 638 F. App'x 778, 785-86 (10th Cir. 2016).  Trans Coastal likewise cannot demonstrate that the Fact Sheet was "sufficiently disseminated among (and not just

### C. 2011 Letter from Chuck Lee of Syngenta.

The Court has also dismissed Lanham Act claims based on a 2011 letter from Chuck Lee of Syngenta. *See* DeLong MTD Order at 4 (citing *In re Syngenta AG MIR 162 Corn Litig.*, 249 F. Supp. 3d 1224, 1230-31 (D. Kan 2017) (finding plaintiffs had not presented evidence that farmers were influenced by the letter); LDC MTD Order, 2018 WL 489098, at *2-3). As with the Plant With Confidence Fact Sheet, the Court found that plaintiffs could not rely on any representations made after July 2011 because "any contamination would already have been inevitable under the plaintiff's theory because of the prior sales and planting of the seed in the 2010-11 season." DeLong MTD Order at 4 (citing LDC MTD Order, 2018 WL 489098, at *2-3). Trans Coastal's Lanham Act claims should be disposed of similarly here.

## II. TRANS COASTAL'S NEGLIGENCE CLAIM FAILS AS A MATTER OF LAW.

Trans Coastal's negligence claim fails for two independent reasons: (1) Syngenta owes no duty to Trans Coastal for Trans Coastal's purely economic losses under the economic loss doctrine ("ELD"); and (2) Syngenta's commercialization of MIR162 was not the proximate cause of Trans Coastal's alleged damages.

### A. Trans Coastal's Negligence Claim Fails Under The Economic Loss Doctrine.

At the pleading stage, the Court recognized that "all of plaintiffs' claims for economic damages would be subject to the ELD if the Court concludes that the doctrine should otherwise be applied here." MDL MTD Order, 131 F. Supp. 3d at 1194. Whether Illinois or California law governs Trans Coastal's state-law tort claims remains an open question that the Court has not

---

available to) the relevant segment of the public, namely Syngenta's customers" (which Trans Coastal is not). MDL MTD Order, 131 F. Supp. 3d at 1227.

decided to date. As explained below, however, Trans Coastal's negligence claim fails under both Illinois's and California's ELD.

### 1.    The Illinois ELD Bars Trans Coastal's Claims.

Under Illinois law, "solely economic losses are generally not recoverable in tort actions." *In re Chicago Flood Litig.*, 680 N.E. 2d 265, 274 (Ill. 1997). Illinois law recognizes only a handful of exceptions to this rule, none of which applies here: when (1) a plaintiff suffered personal injury or property damages; (2) plaintiff's damages were "proximately caused by a defendant's intentional, false representation, *i.e.*, fraud"; (3) plaintiff's damages were "proximately caused by a negligent misrepresentation by a defendant in the business of supplying information for the guidance of others in their business transactions"; or when (4) "a service professional has duties to his client that arise independently of his contractual duties." *Receivership Mgmt., Inc. v. AEU Holdings, LLC*, No. 18 C 8167, 2019 WL 4189466, at *18 (N.D. Ill. Sept. 4, 2019). The Court has recognized that Trans Coastal does not allege physical damage. *See* MDL MTD Order, 131 F. Supp. 3d at 1194. Trans Coastal likewise cannot show that it relied on, much less was damaged by, any intentional misrepresentations by Syngenta. *See infra* § III. Finally, Syngenta is not a service professional that had a contractual relationship with Trans Coastal. *See Receivership Mgmt.*, 2019 WL 4189466, at *19-20 (service professionals must have "specialized knowledge and expertise, and the exercise of discretion," such as financial advisors, "attorneys, accountants, insurance brokers, and surveyors"). Thus, as Trans Coastal already conceded at the pleading stage in arguing against the application of Illinois law to the negligent misrepresentation claim that the

Court dismissed,[5] Illinois's economic loss doctrine forecloses its negligence claim as a matter of law.[6]

Illinois law also makes clear that the ELD precludes recovery where, as here, the parties "could have allocated their risks in contract." *See, e.g.*, *Metro. Water*, 13 N.E.3d at 61. That is precisely what Trans Coastal did when it contracted to allocate the risk of rejection due to unapproved GMO events in its shipments. *See, e.g.*, SOF ¶¶ 73-79. Trans Coastal's pursuit of purely economic losses in these circumstances would result in the type of "open-ended tort liability" the Illinois ELD was intended to avoid. *See In re Chicago Flood Litig.*, 680 N.E.2d at 274-76.

Although the Court previously allowed producers to sue for economic losses under Illinois law, that conclusion does not apply on this record in this case.[7] To begin, under Illinois law, foreseeability alone is not sufficient to create a duty in tort to protect against purely economic losses. *Redarowicz v. Ohlendorf*, 441 N.E.2d 324, 326 (Ill. 1982) (explaining that even though

---

[5]   *See* ECF No. 927, Pls.' Memo. in Opp'n to Syngenta's Mot. to Dismiss, at 109 ("There are at least three possible jurisdictions whose law might apply, depending on facts developed in discovery: Illinois, Minnesota, and California. . . . *[T]he latter two* would not apply the ELD." (emphasis added)).

[6]   At the pleading stage, the Court found that there may be other exceptions to the Illinois ELD. MDL MTD Order, 131 F. Supp. 3d at 1202-03 (citing *Metro. Water Reclamation Dist. of Greater Chicago v. Terra Found. for Am. Art*, 13 N.E.3d 44 (Ill. App. Ct. 2014)). Subsequent decisions, however, have stated that there are only limited exceptions to the rule. *See, e.g.*, *Hecktman v. Pac. Indem. Co.*, 59 N.E.3d 868, 873-74 (Ill. App. Ct. 1st Dist. 2016) ("There are only three recognized exceptions . . . ."); *In re Syngenta Mass Tort Actions*, No. 3:15-cv-01121-DRH, 2017 WL 713694, at *7 (S.D. Ill. Feb. 20, 2017) (Herndon, J.) (same). But even if there were additional exceptions along the lines identified in *Metropolitan Water*—for claims seeking economic losses for intentional, ongoing harm—it would have no application to Trans Coastal's negligence claim. Illinois courts have recognized that the ELD does not apply to claims for intentional interference, but Trans Coastal's Complaint does not plead that cause of action. *See* 13 N.E.2d at 61 (ELD not applicable to "on-going, continuous, and intentional interference with easement rights"); *id.* at 60 (noting cases where ELD was not applicable to claims for "intentional interference with contract and prospective advantage").

[7]   The Court did not decide at the pleading stage whether Illinois's ELD bars Trans Coastal's negligence claim. MDL MTD Order, 131 F. Supp. 3d at 1207 ("Syngenta claims that Illinois law governs the claims by plaintiff Trans Coastal Supply Company, Inc., but it has not discussed the law of that state in making this [ELD] argument, which the Court therefore rejects as applied to that plaintiff.").

harm to plaintiff was foreseeable, "a plaintiff cannot recover solely economic losses in tort"). Moreover, the alleged damages Trans Coastal seeks here—literally the entire difference between its "projected" performance across all business lines and its actual performance untethered to corn, DDGS, or China, as well as damages incurred on contracts signed months after China began rejecting U.S. corn shipments—are far too remote to support any claim of foreseeability. *See infra* § V; SOF ¶¶ 101-03. Syngenta respectfully submits that these are not the type of "foreseeable and foreseen consequences" contemplated by the Court in its prior analysis of the ELD, especially when nothing in the record suggests that Syngenta foresaw anything resembling the speculative and untethered losses that Trans Coastal seeks here. *See* MDL MTD Order, 131 F. Supp. 3d at 1196.

The fact that Trans Coastal could have protected itself against such risks also distinguishes this case from the MDL producer cases. *See, e.g.*, *Trans States Airlines v. Pratt & Whitney Canada, Inc.*, 682 N.E.2d 45, 58 (Ill. 1997) ("Given the foreseeable consequences that a defective engine would result in damage to the airframe, we believe that parties to the sublease agreement could have bargained in consideration of such risks."). It is undisputed that Trans Coastal understood the risks of shipping U.S. corn and DDGS to China that might contain unapproved GMO events. *See, e.g.*, SOF ¶¶ 66-68, 94-95. In fact, Trans Coastal specifically accounted for this risk when negotiating its sales contracts. SOF ¶¶ 73-79. Trans Coastal was thus equally equipped to manage the risk and avoid purely economic losses purportedly resulting from Syngenta's commercialization of MIR162.

### 2. A Contrary Ruling Would Trigger Illinois Choice-of-Law Principles And Require The Application Of California Law—Which Squarely Precludes Trans Coastal's Negligence Claim.

Even if the Court were to conclude that Illinois law would allow a non-producer to sue for purely economic losses and that Trans Coastal's negligence claim does not fail for the reasons

discussed below, *infra* § II.B, the result would simply be to recognize an outcome-determinative conflict with California law—based on the California Supreme Court's recent pronouncement of California's ELD—so as to require a choice-of-law analysis. *See S. Cal. Gas Leak Cases* ("*S. Cal. Gas*"), 7 Cal. 5th 391, 412 (Cal. 2019) (affirming dismissal of negligence claim brought by business owners dislocated after gas leak, concluding that gas company did not owe a duty in tort to protect plaintiffs from purely economic losses despite the foreseeable risk that a gas leak would disrupt their operations and cause lost profits). To determine the law that applies if a conflict is outcome determinative, Illinois follows the Restatement (Second) of Conflict of Laws (1971) and uses the most significant relationship test. *See Townsend*, 879 N.E.2d at 898 (Ill. 2007). Under that test, courts evaluate the following factors: (1) where the injury occurred; (2) where the injury-causing conduct occurred; (3) the domicile of the parties; and (4) where the relationship of the parties is centered. *Id*. at 160; *see also Fed. Ins. Co. v. J.K. Mfg. Co.*, 933 F. Supp. 2d 1065, 1076 (N.D. Ill. 2013) (applying Illinois choice-of-law rules). Courts also consider relevant policies and interests of the forum and other interested states, and the basic policy underlying the particular field of law. *See Fed. Ins. Co.*, 933 F. Supp. 2d at 1076. Under these considerations, California law governs Trans Coastal's negligence claim if the Court finds an outcome-determinative conflict.

Although Trans Coastal is headquartered in Illinois, it primarily conducted its export business to China through its California office. SOF ¶¶ 36-47. Trans Coastal's marketing team in Brea, California was responsible for soliciting and negotiating the sale of commodities to Chinese buyers. *See* SOF ¶¶ 37-38. Brea-area employees were responsible for staying in regular contact with Trans Coastal's customers in China about events impacting their business, including issues relating to MIR162. *See, e.g.*, SOF ¶ 47. The Brea office was also responsible for working with

and "screening" Trans Coastal's Chinese buyers.  *See, e.g.*, SOF ¶¶ 41-42.  As part of their responsibilities, Brea-office employees communicated with Syngenta to obtain the necessary GMO biosafety certificates.  *See* SOF ¶¶ 44-46.  Trans Coastal also transported a significant amount of its China-bound commodities from the ports of Los Angeles and Long Beach.  *See, e.g.*, SOF ¶ 43.  Accordingly, to the extent there was any injury arising from Trans Coastal's sale of corn or DDGS to China, that injury would have been felt primarily in California.

The remaining choice-of-law factors also support the application of California law if the Court finds a conflict with Illinois law.  While the conduct purportedly giving rise to the injury (i.e., the sale of Viptera seed) occurred nationwide, Trans Coastal's theories of the case—which are considered when assessing this factor, *see Townsend*, 879 N.E.2d at 905—include a separate cause of action alleged under California law that would not exist if Illinois law applied.  ECF No. 2530 at 103 ("Count V - Negligent Interference with Prospective Economic Relations Under California Law"); *see also, e.g.*, *766347 Ontario Ltd.*, 249 F. Supp. 2d at 992 ("Illinois does not recognize a cause of action for negligent interference with commercial contracts where the plaintiff, as here, seeks to recover only economic damages." (collecting cases)).[8]

Moreover, given that Trans Coastal's business with China was conducted from California, the parties' relationship as it relates to Trans Coastal's negligence allegations was centered—if centered anywhere—in California.  Although Trans Coastal is headquartered in Illinois, the relevant factors as a whole weigh in favor of applying California law.  *See Townsend*, 879 N.E.2d at 902-03; *see also In re Fluidmaster, Inc.*, No. 14-cv-5696, 2017 WL 1196990, at *34 (N.D. Ill.

---

[8]     Even more, Trans Coastal itself previously argued for the application of California law in opposing dismissal of its negligent misrepresentation claim.  ECF No. 927, Pls.' Mem. in Opp'n to Syngenta's Mot. to Dismiss Producer and Non-Producer Pls.' Amended Class Action Master Complaints, at 112-14.

Mar. 31, 2017) (explaining that in tort cases, courts afford less weight to domicile and where the parties' relationship is centered).

Finally, nothing in Illinois public policy would weigh against the application of California law. Both Illinois and California have an interest in protecting against boundless tort liability. The general rule in Illinois is that, "[a]bsent injury to a plaintiff's person or property, a claim presents an economic loss not recoverable in tort." *In re Chicago Food Litig.*, 680 N.E.2d at 275. In short, even if the Court were inclined to extend its ELD ruling concerning Illinois producers to Illinois non-producers as well, the result would simply expose an outcome-determinative conflict requiring the application of California law to Trans Coastal's negligence claim. California law, in turn, also shows why that claim fails as a matter of law.

### 3. California's ELD Bars Trans Coastal's Negligence Claim.

The California Supreme Court has squarely held that, absent a special relationship between the parties, a plaintiff cannot sue in negligence to recover for purely economic losses. *S. Cal. Gas*, 7 Cal. 5th at 398; *see also Cty. of Santa Clara v. Atl. Richfield Co.*, 137 Cal. App. 4th 292, 318 (Cal. Ct. App. 2006) ("In a . . . negligence case, the *compensable injury* must be *physical harm to persons or property*, not mere economic loss." (emphasis in original)). This bright-line rule applies even when economic losses were clearly foreseeable to the defendant. *See S. Cal. Gas*, 7 Cal. 5th at 408-09 (explaining that if the court "were to permit recovery for purely economic losses in this case" for businesses within a five-mile radius of a gas leak, "we don't see how we could justify denying it" in cases involving other foreseeable losses). Accordingly, the ELD applies to bar Trans Coastal's negligence claim unless it can prove a "special relationship."

Under California law, a "special relationship" exists only when "the plaintiff was an intended beneficiary of a particular transaction but was harmed by the defendant's negligence in carrying it out." *S. Cal. Gas*, 7 Cal. 5th at 400. As the California Supreme Court has explained,

35

the plaintiff must be a *specifically intended beneficiary*—such as in the relationship between the notary of a will and the will's beneficiaries (citing *Biakanja v. Irving*, 49 Cal. 2d 647 (Cal. 1958)), or "between a restaurant operator and a contractor hired by a third-party property owner to renovate the space rented by the restaurant operator" (citing *J'Aire Corp. v. Gregory*, 598 P.2d 60 (Cal. 1979)). *Id.* at 400-01. As a result, California courts have repeatedly rejected finding a special relationship even when the defendant could have foreseen the effects of its allegedly negligent conduct. *See Bily v. Arthur Young & Co.*, 3 Cal. 4th 370, 376-79, 398 (Cal. 1992) (finding that the ELD barred investors in a failed company from suing the company's auditor for negligent preparation of an annual report, because the auditor's special relationship was only with the company itself).

Nothing in the record suggests that Syngenta had Trans Coastal in mind when it commercialized Viptera and Duracade, much less that Trans Coastal was specifically intended to benefit from the way in which Syngenta launched these products in the U.S. Nor can Trans Coastal point to any *particular transaction*—like a will or renovation project—in which it could say Syngenta specifically and knowingly intended it to be a beneficiary of its actions. Because Trans Coastal cannot make this showing, California law precludes any claim based in negligence under the economic loss doctrine.[9]

---

[9]  While the Court found at the pleading stage that Trans Coastal had alleged a special relationship because of Trans Coastal's "allegation that Syngenta actually foresaw the harm to plaintiffs," MDL MTD Order, 131 F. Supp. 3d at 1221, the California Supreme Court recently clarified that "whether to impose a duty of care turns on a careful consideration of 'the sum total' of the policy considerations at play, not a mere tallying of some finite, one-size-fits all set of factors" including foreseeability. *S. Cal. Gas*, 7 Cal. 5th at 401. In so doing, the California Supreme Court emphasized that "more than mere foreseeability for imposing a duty of care" is required because of "the need to safeguard the efficacy of tort law by setting meaningful limits on liability." *Id.* at 401-02. Application of the ELD here is entirely consistent with the policy considerations of limiting tort liability "without end" and avoiding line drawing. *See id.* at 408-12. But even considering the foreseeability factor, the undisputed evidence demonstrates that Trans Coastal's claimed injury (*see infra* § V) was remote and not foreseeable—especially given its decision to sign contracts and continue shipping DDGS with MIR162 even after China began rejecting shipments in November 2013. Given the absence of foreseeability when it comes to such losses, it would be fully

**B.**    **Trans Coastal's Negligence Claim Fails As A Matter Of Law Because Syngenta's Conduct Was Not The Proximate Cause Of Trans Coastal's Damages.**

Trans Coastal's negligence claim also fails because Trans Coastal cannot establish that Syngenta's conduct was the proximate cause of its alleged injuries.

Under both Illinois law and California law, Trans Coastal must show that its alleged injuries were a reasonably foreseeable and likely result of Syngenta's conduct. *See Abrams v. City of Chicago*, 811 N.E. 2d 670, 674 (Ill. 2004) ("The relevant inquiry is whether the injury is of a type that a reasonable person would see as a *likely result* of his or her conduct.") (emphasis in original) (internal quotation marks and citation omitted); *see also Schrimsher v. Bryson*, 58 Cal. App. 3d 660, 664 (Cal. Ct. App. 1976); *Constance B. v. State of California*, 178 Cal. App. 3d 200, 209 (Cal. Ct. App. 1986). Legal cause cannot be shown where, as here, there are this many steps between a plaintiff's alleged injuries and the defendant's alleged misconduct. "The general tendency of the law, in regard to damages at least, is not to go beyond the first step" in the causal chain, *Holmes v. Sec. Inv'r Prot. Corp.*, 503 U.S. 258, 271-72 (1992), because the law "does not attribute remote consequences to a defendant," *S. Pac. Co. v. Darnell-Tzenzer Lumber Co.*, 245 U.S. 531, 533-34 (1918). The causal connection must be based on evidence, not conjecture or possibilities. *See Berke v. Manilow*, 63 N.E.3d 194, 206 (Ill. App. Ct. 2016); *Grotheer v. Escape Adventures, Inc.*, 14 Cal. App. 5th 1283, 1304 (Cal. Ct. App. 2017).

Trans Coastal's negligence claim cannot survive summary judgment because the undisputed evidence shows that Trans Coastal's alleged losses resulted from its business decision to enter into contracts to ship U.S. corn and DDGS containing MIR162 to China, even though

---

consistent with the Court's prior rulings regarding the MDL producer plaintiffs to find that Syngenta nonetheless owed no duty to Trans Coastal.

MIR162 had not been approved for import into China and China had already started rejecting shipments in November 2013. *See* SOF ¶¶ 94-100. Courts have repeatedly recognized that a party's voluntary decisions in the face of known risks breaks the required causal nexus between the defendant's challenged actions and the plaintiff's alleged harm. *See Johnson v. Utopia Tours, Inc.*, No. 2–12–0024, 2012 WL 6969136, at \*5 (Ill. App. Ct. Nov. 6, 2012) (granting summary judgment on finding that defendants did not cause plaintiff's injury "nor reasonably could they have anticipated the plaintiff's decision as a likely consequence of their conduct").

Trans Coastal employees have repeatedly acknowledged that MIR162 was present throughout the U.S. corn supply, that MIR162 would be present in shipments of DDGS, and that the company was well aware of the risk of shipping to China. *See* SOF ¶¶ 66-72, 80-81, 94, 96-97. Trans Coastal nonetheless elected to sell U.S. DDGS to Chinese buyers throughout 2013 and well into 2014, even entering into new contracts as late as mid-2014—*more than six months* after rejections started in November 2013. *See* SOF ¶¶ 94, 96-97. During that period, Trans Coastal repeatedly weighed the risks of rejections against the potential rewards and decided to continue selling to China in 2014. *See* SOF ¶¶ 80-81, 94-100. Indeed, Robert Briscoe, one of Trans Coastal's owners, testified that although he had concerns about MIR162 in November or December of 2013, he did not instruct Trans Coastal staff to stop selling to China. *See* SOF ¶ 96.

Trans Coastal instead shipped U.S. corn and DDGS to China in 2013 and 2014, pursuant to contracts requiring its customers to assume the risk of rejection due to the presence of MIR162. *See, e.g.*, SOF ¶¶ 74-78. The following provision from one of Trans Coastal's sales contracts dated April 1, 2014 is exemplary: "The DDGS purchased and shipped on this contract have the risk of containing unapproved GMO trait MIR 162. Risk of rejection and any cost associated with this

will be for buyer account." SOF ¶ 75. Another contract dated March 24, 2014 expressly referred to "MIR162 and non-registered risk for buyer." SOF ¶ 74.

Trans Coastal was fully aware of the significance of these provisions. For example, Pam Moses, Trans Coastal's President, wrote at the time: "Everyone knew the risks when we shipped it. Even if negative at origin which wasn't [sic] guaranteed, it still had risk at destination." SOF ¶ 79. Trans Coastal also attempted to hold its customers responsible for their contractual agreement to accept the risks and expenses associated with unapproved GMO events like MIR162. *See, e.g.*, SOF ¶¶ 70, 78. In one instance, when a customer sought costs from Trans Coastal, Ms. Moses emphasized that this "is not what we contracted nor what we will agree to . . . . In addition, they will be on a no trade list until the payment for diversions and demurrage is paid. It's unfortunate but true." SOF ¶ 78.[10]

Any duty that Syngenta might have owed to U.S. corn farmers under the Court's rulings to date simply cannot be traced through Trans Coastal's *voluntary business decision* to sell and ship DDGS and corn to China pursuant to contracts in which it successfully required its customers to assume the risk of rejections. It is not reasonably foreseeable that any exporter would knowingly sell commodities containing unapproved GMO events to Chinese customers, much less enter into *new* contracts even after the rejections began. The law does not make Syngenta the guarantor of Trans Coastal's own choices or its inability to enforce negotiated contractual agreements with customers. *See Johnson*, 2012 WL 6969136, at *5.

---

[10] Trans Coastal's damages claims are even further removed because they are premised in substantial part on alleged breaches of contract by third-party Chinese buyers and breach of contract claims asserted against Trans Coastal by third-party DDGS sellers. *See* SOF ¶ 103.

## III. THE COURT SHOULD GRANT SUMMARY JUDGMENT DISMISSING TRANS COASTAL'S FRAUDULENT MISREPRESENTATION CLAIM.

To prevail on a fraudulent misrepresentation claim, Trans Coastal must show: (1) Syngenta knowingly made a false statement of material fact to Trans Coastal; with (2) the intent to induce Trans Coastal's reliance; (3) that Trans Coastal actually and justifiably relied on the alleged misstatement; and (4) that Trans Coastal suffered damages as a result of that reliance. *See Kopley Grp. V., L.P. v. Sheridan Edgewater Props., Ltd.*, 879 N.E.2d 218, 228-29 (Ill. App. Ct. 2007); *see also Conroy v. Regents of Univ. of Cal.*, 45 Cal. 4th 1244, 1255 (Cal. 2009) (same elements give rise to the tort action for fraudulent misrepresentation under California law). Trans Coastal cannot prove any of these elements.

### A. Trans Coastal Cannot Show That Syngenta Made A False Statement Of Material Fact To It.

Trans Coastal cannot demonstrate even the first element of its fraudulent misrepresentation claim—that Syngenta made a false statement of material fact *to Trans Coastal*. Trans Coastal identifies the following supposed misrepresentations regarding Chinese approval of MIR162 for import:

1. The 2011 Letter, ECF No. 451 (NPP Am. Compl.) ¶ 197; ECF No. 927 (Pls.' Opp'n to Syngenta's Mot. to Dismiss), at 103); Ex. 73 (10/6/2016 Trans Coastal's Second Supplemental Responses to Syngenta' Crop Protection's First Set of Interrogatories, at 17, Interrogatory No. 13);

2. Syngenta CEO Mike Mack's statements on a 2012 earnings call, ECF No. 451 (NPP Am. Compl.) ¶¶ 222-23; ECF No. 927 (Pls.' Opp'n to Syngenta's Mot. to Dismiss) at 103); ECF No. 927 at 103; Ex. 73 (10/6/2016 Trans Coastal's Second Supplemental Responses to Syngenta' Crop Protection's First Set of Interrogatories, at 17, Interrogatory No. 13);

3. The biosafety certificate request form, ECF No. 451 (NPP Am. Compl.) ¶¶ 226-27; ECF No. 927 (Pls.' Opp'n to Syngenta's Mot. to Dismiss) at 103); ECF No. 927 at 103; Ex. 73 (10/6/2016 Trans Coastal's Second Supplemental Responses to Syngenta' Crop Protection's First Set of Interrogatories, at 17, Interrogatory No. 13);

4.  Statements during phone calls organized by the U.S Grains Council, Ex. 73 (10/6/2016 Trans Coastal's Second Supplemental Responses to Syngenta' Crop Protection's First Set of Interrogatories, at 18, Interrogatory No. 13);

5.  The Plant With Confidence Fact Sheet, ECF No. 451 (NPP Am. Compl.) ¶¶ 227-28; ECF No. 927 (Pls.' Opp'n to Syngenta's Mot. to Dismiss) at 103); Ex. 73 (10/6/2016 Trans Coastal's Second Supplemental Responses to Syngenta' Crop Protection's First Set of Interrogatories, at17, Interrogatory No. 13).

But Trans Coastal cannot say that it read, heard, or received *any* of these alleged misrepresentations:

1.  Trans Coastal's President and corporate representative, Ms. Moses, could not testify that Trans Coastal received, much less read, the 2011 Letter. SOF ¶ 83 (Trans Coastal does not know whether it ever received the 2011 Letter or that anyone at Trans Coastal ever read it).

2.  Trans Coastal is not aware whether any of its employees listened to the 2012 earnings call or read a transcript of it. *See* SOF ¶ 84.

3.  Trans Coastal cannot provide any evidence that it believed Syngenta's biosafety certificate request form to be any sort of affirmative representation about approval. *See* SOF ¶ 86 ("Q. You didn't believe MIR162 was approved when you sent [the request form] in; right? A. I don't know.").[11]

4.  Trans Coastal could not recall "anything that anyone from Syngenta said" on conference calls through the U.S. Grains Council. SOF ¶ 85.

5.  Trans Coastal can provide no evidence that it read or relied on the Plant With Confidence Fact Sheet. *See* SOF ¶ 88.

If this were not enough, when asked to identify the statements it claims to have relied on, Ms. Moses responded: "***That's an impossibility***." SOF ¶ 90 (emphasis added). And although she was presented to testify about each alleged false or misleading representation Trans Coastal claims to have relied on, Ms. Moses said she could not identify alleged misrepresentations unless she was

---

[11] Ms. Li could not testify that she knew anyone at Syngenta or that she had ever spoke with anyone at Syngenta other than emailing in the biosafety certificate request form. *See* SOF ¶ 44.

provided with internet access during the deposition. SOF ¶ 89.[12] With no evidence that it received

or relied on *any* representation made by Syngenta, Trans Coastal takes the untenable position that

"[s]o long as a representation was made to the marketplace, that representation was made to [Trans

Coastal.]" SOF ¶ 91. That is not the law: this is not a 10(b)(5) case and Trans Coastal cannot rely

on a "fraud on the market" theory. Both Illinois and California law require Trans Coastal to prove

that it received and relied on specific, identifiable misrepresentations by Syngenta. *See In re*

*Soybean Futures Litig.*, 892 F. Supp. 1025, 1060 (N.D. Ill. 1995) ("In sum, the court finds that

Plaintiffs cannot rest their common-law fraud claim upon a general 'fraud-on-the-market' theory,

which is not recognized under the laws of Illinois."); *In re Verifone Sec. Litig.*, 784 F. Supp. 1471,

1488 (N.D. Cal. 1992) ("The California Court of Appeal recently . . . concluded: 'California law

does not permit the application of the fraud-on-the-market theory of reliance to causes of action

based on fraud[.]").[13]

**B.** **Trans Coastal Cannot Show That It Actually And Justifiably Relied On Syngenta's Alleged Misstatements.**

Trans Coastal likewise cannot show that it actually (much less justifiably) relied on the

challenged representations. "Actual reliance occurs when a misrepresentation in 'an immediate

cause of [a plaintiff's] conduct, which alters his legal relations,' and when, absent such

representation, 'he would not, in all reasonable probability, have entered into the contract or other

---

[12] Trans Coastal's inability to identify any alleged false representation made to it regarding the approval status of MIR162 in China also undermines another necessary element of its misrepresentation claim—that it *actually* relied on any purported misrepresentation. *See infra* § III.B.

[13] Finally, "an expression of opinion will not support an action for fraud." *Ill. Non-Profit Risk Mgmt. Ass'n v. Human Serv. Center of S. Metro-East*, 884 N.E.2d 700, 710 (Ill. App. Ct. 2008); *Graham v. Bank of Am., N.A.*, 226 Cal. App. 4th 594, 607 (Cal. Ct. App. 2014) ("[S]tatements regarding future events are merely deemed opinions."). Trans Coastal has relied in its complaint primarily on statements from Syngenta employees about Syngenta's *expectation* that China would approve MIR162 for import by the end of the first quarter of 2012, *see supra* at 40. Each of the alleged misrepresentations Trans Coastal challenges were predictions about future events—indeed, future government acts—and cannot be treated as false statements of fact as a matter of law. *See Ill. Non-Profit Risk Mgmt. Ass'n*, 884 N.E.2d at 710; *Graham*, 226 Cal. App. 4th at 607.

transaction." *Conroy*, 45 Cal. 4th at 1256 (citing *Engalla v. Permanente Med. Grp., Inc.*, 15 Cal. 4th 951, 976-77 (Cal. 1997)); *see also In re Soybean Futures Litig.*, 892 F. Supp. at 1060. Here, Ms. Moses *admitted* that she could not say that Trans Coastal relied on *any* statements made by Syngenta:

> Q:   Did you rely on any statements by Syngenta in making
>      decisions to enter into contracts to sell corn and DDGS to
>      China in 2013 and 2014?
> A:   I can't tell you that I did or I didn't.

SOF ¶ 92. Ms. Moses also could not identify anything that was said on calls with the U.S. Grains Council, whether by Syngenta or anyone else, or anything that Trans Coastal did in reliance on statements made in those calls. *See* SOF ¶ 85.[14]

Even if Trans Coastal could show that it actually relied on Syngenta's representations, it cannot show that its reliance was justifiable. Reliance is not justified if a party closes its eyes to available information, or if the plaintiff had ample opportunity to discover the truth of the alleged misrepresentations. *See Kopley*, 876 N.E.2d at 228; *All. Mortg. Co. v. Rothwell*, 10 Cal. 4th 1226, 1240 (Cal. 1995) (emphasizing that plaintiff's negligence in failing to discover the truth of a statement is no defense, but if plaintiff's conduct in light of his own intelligence and information was unreasonable, he will be denied recovery). Justifiable reliance may be decided as a matter of law if reasonable minds could only come to one conclusion given the facts. *See Kopley,* 876 N.E.2d at 228-29; *Guido v. Koopman*, 1 Cal. App. 4th 837, 843 (Cal. Ct. App. 1991).

Here, Trans Coastal cannot show justifiable reliance on any of the challenged representations after 2012 came and went without Chinese approval of MIR162. This includes the 2011 Letter and the 2012 earnings conference call. Indeed, in the LDC case, the Court held that

---

[14]   *See also* SOF ¶ 86 ("Q. You didn't believe MIR162 was approved when you sent [the biosafety certificate request form] in; right? A. I don't know.").

"once Spring 2012 passed without Chinese approval of MIR 162, the July 2011 and January 2012 representations had been proved false, and LDC could no longer rely reasonably on those representations."  LDC MTD Order, 2018 WL 489098, at *8-9 (granting Syngenta's motion to dismiss LDC's fraud claim based on affirmative misrepresentations); *see also* DeLong MTD Order at 12.  Again, Trans Coastal has identified no reason for the Court to depart from its previous rulings.[15]  Nor would Trans Coastal have been reasonable in relying on any purported misrepresentation made after the spring of 2012 when it knew MIR162 remained unapproved in China and particularly when it entered into the majority of its DDGS contracts in 2014, long after it knew that China had started rejecting U.S. corn citing the presence of MIR162.[16]

### C.  Trans Coastal Cannot Show That Syngenta Knew Or Believed That Any Alleged False Statement Was False When Syngenta Made It.

Finally, Trans Coastal cannot show that Syngenta's predictions were subjectively believed to be false when made.  For a statement about the future to become actionable as a misrepresentation, Trans Coastal must show that Syngenta *subjectively disbelieved* them when they were made.  *See Bonhomme v. St. James*, 970 N.E.2d 1, 10 (Ill. 2012) (noting that "[t]o prevail on a claim of fraudulent misrepresentation, a plaintiff must establish" that the fact at issue must be

---

[15]  To the extent Trans Costal claims that it suffered damages from a supposed "loss" of the Chinese market, the undisputed facts show that such damages (if any) were not *caused* by any actions Trans Coastal took in justifiable reliance on Syngenta's statements.  And to the extent Trans Coastal claims that it suffered damages from the rejection of particular shipments in 2013 and 2014, no jury could find that Trans Coastal acted in justifiable reliance on statements from Syngenta when it decided to ship DDGS containing MIR162 to China despite knowing that MIR162 had not yet been approved for import, and when it later entered into *new* contracts through 2014–well after rejections started in November 2013.  *See* LDC MTD Order, 2018 WL 489098, at *8 ("LDC has alleged only damages resulting from the embargo beginning in November 2013, and LDC has not alleged that it contracted in 2011 or early 2012 to ship corn to China that was rejected in late 2013.").

[16]  Trans Coastal does not and cannot allege when the Plant With Confidence Fact Sheet was distributed or provide any other evidence that would support a claim that Trans Coastal actually or justifiably relied on it.  The Fact Sheet was not distributed until March 2014, well after Chinese rejections had already occurred in November 2013, so Trans Coastal could not have actually or justifiably taken any action in reliance on that document even if it had received it.  *See* SOF ¶ 87.  Likewise, Trans Coastal could not have justifiably relied on the biosafety certificate form because it also knew that MIR162 was *not* approved for import at the time.  *See* SOF ¶¶ 66, 86.

"known or believed to be false by the person making it"); *Brosnan v. Tradeline Sols., Inc*., 681 F. Supp. 2d 1094, 1102 (N.D. Cal. 2010) (applying California law) ("Plaintiff must come forward with evidence that could support . . . knowledge by the person making the representation that the statement was not true").  The evidence shows the opposite.  For example, as Chuck Lee has explained without contradiction: "up until this point, you know, we put a fair amount of traits through China, and they had operated on this two-year time frame from USDA deregulation 'til approval. . . . [W]e really hadn't had issues before, and nor had really any of the other companies had any real issues, so we fully expected that this time line would execute."  SOF ¶ 18.

Syngenta's expectation that approval would come in March 2012 was also consistent with the entire industry's then-expected timeline for Chinese approval of GMO events.  As Syngenta's expert Phillip Shull explains, when Syngenta submitted its application in March 2010, "biotech companies could reasonably expect their import applications to be approved approximately 24 months after submitting the initial dossier to the MOA."  SOF ¶ 17.  China had three annual submission windows (March, July, and November), and an event would typically be approved in the next window after field studies had been submitted.  *See id*. ¶ 16.  In August 2011, Syngenta planned to submit field studies in the November window, which it did, and thus expected approval in line with industry understanding in March 2012.  *See* Ex. 16 ¶ 15.[17]

---

[17] Nor can Trans Coastal base its fraudulent misrepresentation claim on an omission theory, because it cannot show that Syngenta owed Trans Coastal any legal duty to disclose.  *Neptuno Reuhand-Und Verwaltungsgesellschaft Mbh v. Arbor*, 692 N.E.2d 812, 817 (Ill. App. Ct. 1998) ("[I]n Illinois, in order to prove fraud by the intentional concealment of a material fact, it is necessary to show the existence of a special or fiduciary relationship, which would raise a duty to speak."); *LiMandri v. Judkins*, 52 Cal. App. 4th 326, 337 (Cal. Ct. App. 1997) (noting that where there is no fiduciary relationship, "such a relationship can only come into being as a result of some sort of *transaction* between the parties").  No such relationship exists here.

## IV. TRANS COASTAL'S NEGLIGENT INTERFERENCE CLAIM FAILS AS A MATTER OF LAW BECAUSE THERE IS NO EVIDENCE TO SUPPORT MULTIPLE ELEMENTS OF THE CAUSE OF ACTION.

Trans Coastal's complaint also includes a claim for negligent interference with prospective economic relations under California law.[18] California law requires a plaintiff asserting that claim to show: (1) the existence of an economic relationship between it and a third party "containing the probability of future economic benefit"; (2) that the defendant had knowledge of that relationship; (3) that the defendant had "knowledge (actual or construed) that the relationship would be disrupted if [it] failed to act with reasonable care"; (4) that the defendant failed to act with reasonable care; (5) an "actual disruption of the relationship"; and (6) that the defendant's conduct proximately caused the economic harm. *Redfearn v. Trader Joe's Co.*, 20 Cal. App. 5th 989, 1005 (Cal. Ct. App. 2d Dist. 2018). The defendant's alleged misconduct giving rise to the claim must be wrongful "by some measure beyond the fact of the interference itself." *Della Penna v. Toyota Motor Sales U.S.A., Inc.*, 902 P.2d 740, 751 (Cal. 1995); *see also Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1159 (Cal. 2003) (the wrongful conduct must be "unlawful as 'proscribed by some constitutional, statutory, regulatory, common law, or other determinable legal standard'" (citation omitted)). The plaintiff also must show that the defendant owed it a duty to act with reasonable care. *See Hellenic Petroleum, LLC v. Sacramento Energy Res., LLC*, No. 1:19-CV-0491 AWI SAB, 2019 WL 4747794, at *5 (E.D. Cal. Sept. 30, 2019). Trans Coastal's negligent interference claim fails for multiple, independent reasons.

---

[18] If the Court determines that Illinois law applies to Trans Coastal's negligence claim, that ruling should likewise govern here, and this claim would fail because negligent interference is not cognizable under Illinois law. *See, e.g.*, *766347 Ontario Ltd.*, 249 F. Supp. 2d at 992 ("Illinois does not recognize a cause of action for negligent interference with commercial contracts where the plaintiff, as here, seeks to recover only economic damages." (collecting cases)).

*First*, Trans Coastal cannot show that it had an expectation of reasonably probable business with Chinese buyers of corn and DDGS. "The law precludes recovery for overly speculative expectancies by initially requiring proof the business relationship contained 'the *probability* of future economic benefit to the plaintiff.'" *Westside Center Assocs. v. Safeway Stores 23, Inc.*, 42 Cal. App. 4th 507, 522 (Cal. Ct. App. 1996) (citation omitted). Nothing in the record shows any reasonable expectation of future business with identifiable Chinese buyers. Trans Coastal did not have a history of steady sales to China. In fact, a few years earlier in 2010 and 2011, Trans Coastal's percentage of DDGS sales to China dropped by twenty percent. SOF ¶ 60.[19]

*Second*, the record is devoid of any evidence that Syngenta knew of those relationships and knew that its commercialization of MIR162 would disrupt those relationships. California law requires actual evidence to demonstrate Syngenta's knowledge. Generalizations are not enough. *See Water Inc.*, 2011 WL 13174224, at *19.

*Third*, Trans Coastal cannot show that Syngenta owed it a duty to act with reasonable care, because, as with its negligence claim, Syngenta had no duty to protect Trans Coastal from purely economic losses. *See supra* § II; *see also R Power Biofuels, LLC v. Chemex LLC*, No. 16-CV-00716-LHK, 2016 WL 6663002, at *9 (N.D. Cal. Nov. 11, 2016) (dismissing California negligent interference claim because plaintiff did not establish exception to ELD).

*Fourth*, Trans Coastal cannot establish that Syngenta engaged in any independently wrongful conduct. As discussed above, Trans Coastal's negligence and fraudulent misrepresentation claims fail as a matter of law. *See supra* §§ II-III. Thus, Trans Coastal is left

---

[19]  At the very least, the Court should grant summary judgment to the extent Trans Coastal cannot demonstrate a reasonable expectation of an economic relationship on a buyer-by-buyer basis, and instead relies on vague generalizations about hypothetical future customers buyers. *See, e.g.*, *Water Inc. v. Everpure, Inc.*, CV 09-3389 ABC (SSx), 2011 WL 13174224, at *19 (W.D. Cal. Dec. 19, 2011) (rejecting negligent interference claim because plaintiff "rests on only vague generalizations and no evidence to demonstrate that any prospective economic relationship existed, that Everpure interfered with it, and that Water suffered damage as a result").

with just the alleged interference itself—which is not enough under California law. *See, e.g.*, *Della Penna*, 902 P.2d at 751.

*Fifth*, Trans Coastal cannot show that Syngenta's alleged misconduct proximately caused its alleged damages. *See infra* § V. A plaintiff must show that the alleged injury arising from defendant's negligent interference claim is not "wholly speculative" and is "not part of [its] ordinary business risk." *Pisano v. Am. Leasing*, 146 Cal. App. 3d 194, 197 (Cal. Ct. App. 1983). But here, Trans Coastal specifically contracted with Chinese buyers to allocate the risk of rejection because of the presence of unapproved GMO events. *See* SOF ¶¶ 73-77. That Trans Coastal not only contemplated—but also addressed—these very risks as part of its business forecloses a negligent interference claim.

## V. TRANS COASTAL CANNOT PROVE DAMAGES ATTRIBUTABLE TO SYNGENTA.

Even if Trans Coastal could demonstrate all the other elements of its claims, it cannot recover because it cannot prove its lost profits with reasonable certainty and—having relied on an expert subject to exclusion under Rule 702 and *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1994)—cannot prove any other item of damages.

As a threshold matter, Trans Coastal's damages claims fail because they rely on a damages expert, James Woods, whose opinions do not meet the basic requirements of Rule 702 or *Daubert*. This alone requires dismissal of Trans Coastal's damages claims for the reasons presented in Syngenta's motion to exclude. *See Fisherman Surgical Instruments, LLC v. Tri-anim Health Servs., Inc.*, 502 F. Supp. 2d 1170, 1188-89 (D. Kan. 2007) (excluding plaintiff's claim for lost profits on summary judgment based on exclusion of plaintiff's damages expert under Rule 702 and *Daubert*); ECF No. 45 (MTE J. Woods). At the very least, Trans Coastal's claims should be dismissed to the extent Trans Coastal seeks lost profits—which Trans Coastal cannot reasonably

prove without expert testimony. *See Real Estate Value Co. v. USAir, Inc.*, 979 F. Supp. 731, 744-45 (N.D. Ill. 1997) (concluding that exclusion of expert under *Daubert* in turn meant that "the evidence provided by [plaintiff] does not allow a reasonable fact finder to estimate the amount of lost profits"); *Electronic Funds Solutions, LLC v. Murphy*, 134 Cal. App. 4th 1161, 1181 (Cal. Ct. App. 2005) (noting that demonstrating lost profits with reasonable certainty "generally requires expert testimony concerning 'economic and financial data, market surveys and analyses, business records of similar enterprises' or 'general business conditions and the degree of success of similar enterprises'") (citation omitted).

Even if Woods's opinions were to survive scrutiny under *Daubert*, Trans Coastal cannot pursue its damages claims for the following independent reasons.

### A.     Trans Coastal's Lost Profits Claim Fails Because Illinois And California Law Preclude The Recovery Of Speculative Damages.

The Court should grant summary judgment to the extent Trans Coastal seeks lost profits because it cannot prove those claimed damages with reasonable certainty. *See TAS Distrib. Co. v. Cummins Engine Co.*, 491 F.3d 625, 631 (7th Cir. 2007) (finding evidence of alleged lost profits inadmissible under Illinois law because it was too speculative); *Kids' Universe v. In2Labs*, 95 Cal. App. 4th 870, 886-87 (Cal. Ct. App. 2002) (granting summary judgment because claimed lost profits were speculative and not proven with reasonably certainty). "The award of damages for loss of profits depends upon whether there is a satisfactory basis for estimating what the probable earnings would have been had there been no tort." *Kids' Universe*, 95 Cal. App. 4th at 883 (citing *Nat. Soda Prod. Co. v. City of Los Angeles*, 23 Cal. 2d 193, 199 (1943)); *TAS Distrib.*, 491 F.3d at 631. "Although the amount of lost profits need not be proved with mathematical precision, there must be a reasonable basis for computing the loss." *Greenwich S.F., LLC v. Wong*, 190 Cal. App.

4th 739, 765 (Cal. Ct. App. 2010) (holding that jury's award of lost profits was unduly speculative and uncertain as a matter of law); *TAS Distrib.*, 491 F.3d at 631.

Woods does not separate the amount of Trans Coastal's overall damages comprising "lost profits on lost opportunities," from alleged costs attributable to delayed and cancelled shipments. *See* SOF ¶ 108; ECF No. 45 (MTE J. Woods).  Even if he had, Trans Coastal's inconsistent pattern of sales to China, and Woods's indefensible use of a single, untested, projection extrapolated out over an arbitrary damages period, do not provide the reasonable certainty the law requires.

### 1.     Trans Coastal Lacks A Consistent Track Record Of Exports To China.

Trans Coastal cannot prove its lost profits with reasonable certainty when Trans Coastal's trading history confirms that its exports of corn and DDGS to China were inconsistent in the years leading up to rejections.  For purposes of assessing the degree of certainty required to pursue lost profits, courts generally distinguish between businesses which are "established" and those that are "unestablished."  "The long-standing rule in Illinois is that lost profits may be a measure of damages where a business is interrupted, but the business must have been established prior to the interruption so that the evidence of lost profits is not speculative."  *Drs. Sellke & Conlon, Ltd. v. Twin Oaks Realty, Inc.*, 491 N.E.2d 912, 917 (Ill. App. Ct. 1986) (collecting cases); *see also Sargon Enters., Inc. v. Univ. of S. Cal.*, 55 Cal. 4th 747, 778 (2012) (rejecting lost profits claim where plaintiff had "no track record" on which to reasonably "base its claim to future profits on evidence of its past profits")

In each year from 2010 to 2014, Trans Coastal's sale of DDGS to China changed drastically for various reasons.  In 2010, Trans Coastal's "[f]irst year trading with China," it sold 13,751 metric tons of DDGS to China.  *See* SOF ¶ 58.  The following year, in 2011, "[t]he year of the anti dumping charges against DDGS traders," Trans Coastal's DDGS sales to China dropped by more

than half to 6,617 metric tons. *See* SOF ¶ 59. In 2012, "anti dumping [was] dropped mid year," and Trans Coastal's DDGS sales to China went to 10,143 metric tons. *See* SOF ¶ 61. In 2013, Trans Coastal sold 19,520 metric tons of DDGS to China. *See* SOF ¶ 62. And even in mid-2016, within Woods's damages period, the Chinese market for DDGS was impacted by another antidumping investigation. *See See* SOF ¶¶ 63-64. Without a stable market or consistent track record of sales, Trans Coastal cannot support its claim for lost profits through 2016. *See Drs. Sellke & Conlon*, 143 Ill. App. 3d at 174; *Kids' Universe*, 95 Cal. App. 4th at 883-84.

## 2. Trans Coastal Cannot Establish A Reasonable Basis For Its Lost Profits Projection.

Nor can Trans Coastal provide sufficient, admissible evidence to establish its lost profits with reasonable certainty. As described more fully in Syngenta's motion to exclude, Woods bases his calculations on a single projection for the year 2014 that Trans Coastal's CFO, David Stanko, created in December *after* China started rejecting U.S. corn based on the purported presence of MIR162. *See* SOF ¶ 104; ECF No. 45 (MTE J. Woods). Although Trans Coastal made similar projections on a monthly basis for its lender and, indeed, had prepared one just days *before* rejections began, Woods did not attempt to ascertain whether any of them had any basis in reality. For example, Woods did not "know what documents [Stanko] looked at" in arriving at the projections, SOF ¶ 105, and did not "assess how any previous projections Mr. Stanko prepared in connection with Trans Coastal's business for years other than 2014 compared with actual results," SOF ¶ 106. Nor does Woods provide any support for using a damages period that extends through August 2016 when MIR162 was approved in China in December 2014. And Trans Coastal's historical profit margins for DDGS varied widely, from 0.53% to 2.65%. *See* SOF ¶ 35. These failures alone underscore that Trans Coastal's lost profits claims are inherently speculative. *See Real Estate Value Co.*, 919 F. Supp. 731 at 744 (excluding lost profits expert opinion "because

they are based on unsupported facts"); *Parlour Enters., Inc. v. Kirin Grp., Inc.*, 152 Cal. App. 4th 281, 289 (Cal. Ct. App. 2007) (finding lost profits claim unduly speculative where "expert did not know the qualifications . . . of the person . . . preparing the projections or methodology used in preparing the projections"). "Although prelitigation projections are relevant and admissible, especially when they are prepared by the defendants, the projections must nevertheless be based on *facts* that are substantially similar to the lost business opportunity. There is no evidence that was done here." *Id.* at 290 (citing *Kids' Universe*, 95 Cal. App. 4th at 886); *Otis v. Doctor's Assocs.*, No. 94 C 4227, 1998 WL 673595, at *6 (N.D. Ill. Sept. 14, 1998) (finding that expert "fail[ed] to provide the reasonable degree of certainty necessary to obtain future lost profits" absent any factual basis to support estimated profits).

Even if Trans Coastal had used a reliable projection supported by reasonable assumptions and an established track record, Trans Coastal's lost profits claim would still fail because it cannot tie its purported lost profits to Syngenta's conduct. "[S]ince lost profits are frequently the result of several intersecting causes, it must be shown with a reasonable degree of certainty that the defendant's [conduct] caused a specific portion of the lost profits." *Midland Hotel Corp. v. Reuben H. Donnelly Corp.*, 515 N.E.2d 61, 66 (Ill. 1987) (holding lost profits were not proven with reasonably certainty where plaintiff "failed to isolate the amount of lost profits, if any, attributable to [the alleged harm]"); *Manneh v. Iverness Med. Innovations, Inc*., No. 08CV653 WQH AJB, 2009 WL 4642390, at *14 (S.D. Cal. Dec. 1, 2009) (applying California law) (holding that lost profits were not shown with reasonable certainty where Plaintiff "fails to assert any specific damages that resulted from [the alleged harm]"). Here, Woods admitted that his model "would attribute any and all losses . . . to MIR162 as long as it occurred after December 2013." SOF ¶ 109. Woods's approach also ignores real-world facts that impacted exports of DDGS to China,

such as a 2016 DDGS anti-dumping investigation.  *See* SOF ¶¶ 65, 111.  Woods's failure to isolate

the effects of MIR162 on Trans Coastal's alleged lost profits and failure to consider facts that

would have impacted Trans Coastal's DDGS shipments to China during his arbitrary damages

period render his lost profits analysis unduly speculative as a matter of law.  For these reasons, the

Court should dismiss Trans Coastal's lost profits claim.

**B.     Trans Coastal Cannot Recover Damages Because It Does Not And Cannot Distinguish Between Losses Purportedly Attributable To Syngenta Or MIR162 As Opposed To Other Causes.**

Trans Coastal's claims should be dismissed because it cannot prove that it suffered

damages *because of* MIR162 or, at the very least, has made no effort to separate out any such

damages from unrelated losses, *supra* §§ II.B., V.A.  *See, e.g.*, *Thompson v. County of Cook*, 609

N.E.2d 290, 293-94 (Ill. 1993) ("[T]he plaintiff must allege and prove . . . that the breach was the

proximate cause of plaintiff's injuries. . . . The cause of an injury is that which *actually* produces

it.") (emphasis added); *Frustuck v. City of Fairfax*, 212 Cal. App. 2d 345, 367-68 (Cal. Ct. App.

1963) ("Whatever the proper measure of damages may be, . . . , the recovery therefor is still subject

to the fundamental rule that damages which are speculative, remote, imaginary, contingent, or

merely possible cannot serve as a legal basis for recovery.").  Trans Coastal bears the burden of

identifying which of its purported losses are attributable to Syngenta and "separating losses for

which they can recover from those for which they cannot recover."  *Harbor House Condo. Ass'n*

*v. Mass. Bay Ins. Co.*, 703 F. Supp. 1313, 1320 (N.D. Ill. 1988).

Instead, Trans Coastal seeks to recover for *all* losses across all business lines throughout

the world after December 2013.  Woods claims that Trans Coastal suffered $66.5 million in losses

based on a comparison of Trans Coastal's purported projected profits against its purported losses.

But he does not identify which of those losses were linked to Syngenta's commercialization of

MIR162 or even, for some categories of damages, which of those losses were tied to Trans

Coastal's sales of DDGS to China. *See generally* Ex. 23 (10/17/2016 J. Woods Rpt.). Because Trans Coastal cannot clearly identify which of its purported losses, if any, are reasonably attributable to Syngenta, it should not be permitted to recover the damages it seeks. *See Harbor House*, 703 F. Supp. at 1320 (granting summary judgment for defendant where plaintiffs sought replacement cost for entire heating system even though only a portion of pipe replacement cost was attributable to defendant); *Manneh*, 2009 WL 4642390, at *14.

As described more fully in Syngenta's motion to exclude, Dr. Woods ignores a wide range of events unrelated to MIR162 or Trans Coastal's sale of DDGS or corn to China that plainly caused Trans Coastal to suffer losses. These include, for example:

- Chinese customers defaulting on *soybean* contracts in 2014. *See, e.g.*, SOF ¶ 115.

- Trans Coastal's falling behind on multiple shipments of corn gluten meal. *See* SOF ¶ 116 ("At this point - we are way behind on shipments - late fees on 1 week for CGM [corn gluten meal] is $12/ton or $300+ per container, and combine 2 weeks of $85/day in per diem, we are under the water on these by another 850+. . . . getting the execution and details correct is where we make or lose money.").

- Trans Coastal facing issues with (and ultimately losing) its line of credit. *See* SOF ¶¶ 48-53.

Dr. Woods does not account for any of these factors in his damages analysis or attempt to identify which purported losses were attributable to Syngenta. To the same effect, Woods attributes the entire $18.3 million of Trans Coastal's alleged washouts to Syngenta, regardless of whether those DDGS were earmarked for sales to China. *See* SOF ¶¶ 32, 112. Woods similarly grouped together losses for costs such as "demurrage, detention, diversion, rejection, portage, drayage, disposal, abandonment, storage, redirection, deferral," together with "lost profits on lost opportunities." SOF ¶ 108. Woods also did not identify how much of that $48.2 million fits into the "increased costs" versus "lost profits" buckets, much less segregate out those costs that were purportedly attributable to DDGS and corn shipments to China versus those that were not. *See*

SOF ¶¶ 108-13.  And Woods readily admits that some of the alleged losses incorporated into his calculation may relate "to products other than DDGS" and to "shipments that were not China bound."  SOF ¶ 113.

This "near total absence of evidence of a causal connection" between Trans Coastal's purported damages and the alleged harm requires dismissal of its claims.  *See Rheumatology Diagnostics Lab., Inc. v. Aetna, Inc.*, No. 12–cv–05847–WHO, 2015 WL 1744330, at *1, *17-18 (N.D. Cal. Apr. 15, 2015) (applying California law) (granting summary judgment on claims "based on damages theories that plaintiffs have to show are more than speculation and guesswork"); *see also Perfection Corp. v. Lochinvar Corp.*, 812 N.E.2d 465, 472-73 (Ill. App. Ct. 2004) ("The party who seeks damages has the burden not only to establish that he sustained damages, but also to establish a reasonable basis for computation of those damages.") (affirming summary judgment where plaintiff failed to provide evidence to support damages theory).

### C.     Trans Coastal's $5.5 Million Claim For Washouts Is Speculative And Arbitrary.

Nor may Trans Coastal recover its alleged $5.5 million in unpaid washouts on sales contracts to Chinese buyers.  Indeed, even though Trans Coastal concedes that those contracts, if executed, would have yielded no more than $460,000 in profit, Trans Coastal nonetheless seeks more than ten times that amount simply because Ms. Moses recorded the washouts as revenue in Trans Coastal's books, but does not expect to collect on them.  *See* SOF ¶ 114.  Because there is no basis for that methodology, the Court should grant summary judgment to the extent Trans Coastal seeks these washouts as damages.  *See Perfection Corp.*, 812 N.E.2d at 471 ("Damages may not be awarded on the basis of speculation and conjecture.") (rejecting expert's damages

conclusions and granting summary judgment for failure to substantiate damages claim); *Rheumatology Diagnostics*, 2015 WL 1744330, at *17-18.[20]

### D. Trans Coastal Cannot Recover Damages For Bribes Paid To Chinese Officials.

Because Trans Coastal cannot differentiate among the various components that make up its damages, Trans Coastal may be seeking reimbursement for bribes paid directly or indirectly Chinese officials. There is ample evidence that Trans Coastal factored bribes into its contract prices in sales to China and later commissioned them after the rejections. For example:

- In December 2012, in discussing the challenges of shipping to various ports in China, Trans Coastal's Sol Kim said "A little bit of bribery could probably easily get the product through." SOF ¶ 118.

- Trans Coastal understood that "[p]rice may go up . . . , in which case [a customer or broker] will take the commission and work something under the table if they deem that is necessary." SOF ¶ 119.

- In assessing its prices on sales of DDGS to China, Trans Coastal factored "all sorts of fees such as . . . under the table fees" into its contract price. SOF ¶ 120. Trans Coastal specifically noted it ought to account for such "under the table fees" in determining how much of a profit it expected to make on it DDGS sales contracts to China. *See* SOF ¶¶ 119-20.

- When Trans Coastal experienced issues with a shipment of DDGS to China and learned that a Chinese "officer would like to have some money ($24154) to guarantee all our containers can be pulled to warehouse directly," Trans Coastal's owner and President instructed her team to "pay it" "[i]f it gets all of it clear to mir 162." SOF ¶ 121.[21]

Given Woods's failure to delineate any specific cost category in his damages analysis, it is reasonably certain that providing Trans Coastal with a full recovery of its claimed damages would result in Syngenta covering the costs of illegal payments to Chinese officials. None of that is

---

[20] Trans Coastal likewise cannot demonstrate any of the elements of its claims with respect to Syngenta's commercialization of Duracade.

[21] When asked about this e-mail at her deposition, Mr. Moses refused to answer and invoked the Fifth Amendment. SOF ¶ 122.

recoverable. *See, e.g.*, *Carruthers v. Flaum*, 365 F. Supp. 2d 448, 470 (S.D.N.Y. 2005) (dismissing plaintiff's claim in part because "they are predicated on the completion of illegal activity").

## <u>CONCLUSION</u>

For the foregoing reasons, Syngenta respectfully requests that the Court grant summary judgment dismissing Trans Coastal's claims.

Dated: November 13, 2019          Respectfully submitted,

/s/ Thomas P. Schult
_____
Thomas P. Schult (tschult@berkowitzoliver.com)
Jennifer B. Wieland (jwieland@berkowitzoliver.com)
Carson M. Hinderks (chinderks@berkowitzoliver.com)
**BERKOWITZ OLIVER LLP**
2600 Grand Boulevard, Suite 1200
Kansas City, MO 64108
Telephone:      (816) 561-7007
Fax:               (816) 561-1888

*Liaison Counsel for Syngenta Defendants*


Leslie M. Smith, P.C. (leslie.smith@kirkland.com)
**KIRKLAND & ELLIS LLP**
300 North LaSalle
Chicago, IL 60654
Telephone: (312) 862-2000
Fax: (312) 862-2200

Michael D. Jones, P.C. (mjones@kirkland.com)
Edwin John U, P.C. (edwin.u@kirkland.com)
Ragan Naresh, P.C. (ragan.naresh@kirkland.com)
Patrick Haney (patrick.haney@kirkland.com)
**KIRKLAND & ELLIS LLP**
1301 Pennsylvania Avenue, N.W.
Washington, D.C.  20004
Telephone:      (202) 389-5000
Fax:               (202) 389-5200

*Lead Counsel for Syngenta Defendants*

**CERTIFICATE OF SERVICE**

I certify that on November 13, 2019, I electronically filed the foregoing with the Clerk of this Court by using the CM/ECF system, which will accomplish service through the Notice of Electronic Filing for parties and attorneys who are Filing Users.

*/s/ Thomas P. Schult*
Thomas P. Schult